UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE EXPORT-IMPORT BANK OF THE REPUBLIC OF CHINA,

        Judgment Creditor,

-against-

GRENADA,

        Judgment Debtor.

06-CV-2469 (HB) (AJP)

**AFFIDAVIT OF RODNEY GEORGE IN SUPPORT OF JOINT MOTION TO VACATE RESTRAINING NOTICES**

---

I, RODNEY GEORGE, state under penalty of perjury as follows:

1. I am the Chairman of the Grenada Airports Authority ("GAA"). I make this affidavit from personal knowledge except as to statements made on information and belief, and as to such statements, I believe them to be true.

2. In May 1985, the Grenadian Parliament passed the Airports Authority Act ("AAA"), which created the GAA. Pursuant to the AAA, the GAA is charged with managing, controlling and supervising the administration of Grenada's airports. In general, the GAA implements this function by owning, operating and maintaining a variety of air transport-related facilities, including airports and related support facilities, and providing a number of services to the entities that utilize these facilities, including baggage and cargo handling, airplane refueling and cleaning, and navigation services, among others.

3. Pursuant to its authority under the AAA, various administrative regulations, and other statutes and acts of the government of Grenada, the GAA is empowered, among other things, to collect the following taxes, fees and charges ("Usage Fees") from all airlines that use and fly into and out of Grenada's airports and related facilities:

1

| Fee/Charge | Purpose |
|---|---|
| Airport Facilitation Charge | Covers provision of miscellaneous terminal services and facilities |
| Airport Service & Security Service Recovery Charge | Funds airport passenger service and security services operations at airports |
| Concourse Fee | Covers charges for introduction of CUTE (Common Use Terminal Equipment) and other airport infrastructure developments |
| Baggage Screening Charge | Funds provision of baggage screening and other airport security measures |
| Airport Capital Improvement Surcharge | Funds airport infrastructure, replacement of navigation aids, and runway repairs |
| Landing Fees | Funds landing operations at airport |
| Navigation/Communication Fee | Funds navigation and communications operations at airports |
| Parking Fee | Funds airport parking operations |
| Overtime Charges | Funds overtime operations at airports (i.e., services provided outside official operational hours) |
| Cargo (Through-put) Charge | Funds cargo operations at airports |

4.   In addition to the Usage Fees, the GAA also collects rental charges in exchange for providing the use of dedicated facilities at its airports to the airlines that fly into and out of Grenada ("Rental Payments," which, together with the Usage Fees, are hereinafter referred to as the "Payments").

5.   The following airlines are those that presently use the GAA's facilities and services and which are, therefore, obligated to make the above-referenced payments: American Airlines, British Airways, American Eagle, Caribbean Airlines, Monarch Airlines, Virgin Atlantic, LIAT, Air Canada, Delta Air Lines, and Saint Vincent Grenada Air (the "Airlines").

6.   Each Airline that is required to make Payments of any kind is responsible for their remittance to the GAA. Rental Payments are made by an agent for each Airline directly to the GAA. Non-domestic Airlines flying into and out of the airports of Grenada remit their Usage Fees through the International Air Transport Association ("IATA"). IATA is an air transport

industry organization that provides a variety of functions to the international air transport community. Among other functions, IATA provides logistical support to entities, such as the GAA, that are responsible for air transport services in a given country or region. In the case of the GAA, IATA functions in part as a clearinghouse for the collection and dissemination of the payments referred to in paragraph 3. Non-domestic Airlines owing the aforementioned payments to the GAA submit them instead to IATA for later dissemination to the GAA.

7. Since April 2010, rather than disseminate the received payments to the GAA, IATA has, pursuant to an Airport Enhancement and Financing Service Agreement to which it and the GAA are parties ("Agreement"), instead forwarded all such Collected Funds directly to First Citizens Trustee Services Limited ("Trustee"), for use in servicing the GAA's obligations with respect to a bond issue that provided financing for the operations of Grenada's main airport. The Agreement acknowledges that the GAA has "definitively and irrevocably transferred, assigned, setover and otherwise conveyed to the Trustee . . . all of its right, title and interest in, to and under . . . all [Usage Fees] and all rights to receive any payments relating to the [Usage Fees.]"

8. The domestic airline operator in Grenada, Saint Vincent Grenada Air, submits its Usage Fees directly to the GAA. Charter and ad hoc airlines operate on a cash basis and submit necessary Usage Fees to the GAA at its Aeronautical Information Services Department prior to flight departures.

9. It is my understanding that the Export-Import Bank of the Republic of China ("EX-IM") has served restraining notices on most if not all of the Airlines, and that these restraining notices call for the Airlines to cease making any and all payments that they are required to make in conjunction with their operations in Grenada. I also understand that

restraining notices have been served on IATA that seek to compel IATA to withhold distribution of the Payments. It is my understanding that basis for these demands is EX-IM's assertion that the nation of Grenada, a judgment debtor to EX-IM, may have a property interest in the Payments that allegedly renders all such Payments attachable under the appropriate law in enforcement of EX-IM's judgment.

10. Grenada, however, has no such interest in the Payments because no payments of any kind relating to air transport or related services in and out of Grenada – including the Payments – are ever paid or owed to Grenada. All such payments, as noted above, are made directly to the GAA or to IATA on behalf of the GAA.

11. The GAA is neither an analog for Grenada, nor part of the government of Grenada. As established under the AAA, the GAA is a legally independent corporate entity with a completely separate juridical existence from the government of Grenada. The GAA can sue and be sued, own property, and borrow, lend, and invest funds, all in its own name. Given that the GAA was created by the government and is tasked with operating Grenada's public air transport system, the government of Grenada naturally has some high-level involvement with the GAA, mainly with respect to the appointment of the members of the GAA's Board of Directors, the provision of general policy guidance to the GAA, approval of major financial endeavors affecting the GAA, and in an auditing and oversight capacity with respect to the GAA's financial statements and budgeting process. The GAA, however, is independently responsible for the day-to-day operation, direction, and maintenance of all services and facilities under its control. The GAA has its own budget and financial statements independent of the government of Grenada, may hire and fire staff independently of the government civil service system, and is largely self-

financing, deriving the nearly all of its operating revenues from collection of the Payments or independent financing which it has arranged.

12. In practice, the GAA's independence from the Government is as clear as it is in the AAA. The GAA's Board has delegated day-to-day operations to a General Manager, who functions like any other private-sector chief executive officer, overseeing and making decisions with respect to such matters as employment, vendor retention, and revenue collection, among others, and reporting, from time to time, back to the Board. The Board oversees the General Manager's day-to-day operation of the GAA, and the Board and General Manager work together to determine how best to effect the GAA's mission with respect to Grenada's air transport system. While the Board gives periodic reports to the government of Grenada and occasionally seeks the approval of the appropriate government minister for major financial decisions that it and/or the General Manager wish to take, the government of Grenada is rarely, if ever, involved in the day-to-day minutiae of the facilities and services overseen by the GAA.

13. The GAA also has no relation to the underlying dispute between EX-IM and Grenada. The GAA was not a party to any of the loan agreements at issue in the dispute, nor was it otherwise responsible for making any payments to EX-IM or any other entity in relation to those loans. EX-IM did not name the GAA as a party in its lawsuit against Grenada, nor, on information and belief, are any of EX-IM's allegations related in any way to any action, inaction, or conduct of the GAA or any of its officers, directors, members or employees. In short, the GAA had no involvement whatsoever with the facts or circumstances that ultimately led to the EX-IM lawsuit and judgment.

14. All payments made to or on behalf of the GAA in conjunction with the fees and charges described above are used by the GAA (or by the Trustee) for the maintenance and

operation of Grenada's air transportation infrastructure. The GAA's expenses in this regard include loan and other financing payments (on debts incurred for such things as airport construction, operation, renovation and repair), facilities maintenance and construction, and the salaries and benefits of employees providing necessary services in conjunction with air transportation.

15. Revenue from the above-referenced fees and charges represents a substantial and significant portion of the GAA's total available funds for operating and maintaining Grenada's air transportation system. Despite the GAA's independence from Grenada, several of the Airlines have, out of an apparent abundance of caution, already begun withholding payments due to the GAA. Even short-term deprivation of these funds as a result of EX-IM's restraining notices will significantly hamper the GAA's ability to fulfill its mission, including its ability to make needed repairs and upgrades to facilities such as runways, terminals, and air traffic control systems, as well as its ability to pay the salaries of the workers who provide Grenada's air transportation services. Continued restraint of these funds will thus have an exceedingly negative impact on air transit within, into and out of Grenada.

Dated: 16th March, 2012

_____
Rodney George
Chairman, Grenada Airports Authority

Sworn to before me this
16th day of March, 2012

_____
Notary Public



LESLIE-ANN SEON
NOTARY PUBLIC
GRENADA W.I.
COM. EXPIRES 2012

6