UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE EXPORT-IMPORT BANK OF : 
THE REPUBLIC OF CHINA, : **06 CV 2469 (HB) (AJP)**
:
Plaintiff/Judgment Creditor, :
:
-against- :
:
GRENADA, :
:
Defendant/Judgment Debtor. :
------------------------------------------------------------X

**REPLY IN FURTHER SUPPORT OF PLAINTIFF/JUDGMENT CREDITOR THE EXPORT-IMPORT BANK OF THE REPUBLIC OF CHINA'S CROSS-MOTION FOR TURNOVER OF FUNDS TO PLAINTIFF/JUDGMENT CREDITOR**

SULLIVAN & WORCESTER LLP
Paul E. Summit
Andrew T. Solomon
Courtney Evanchuk
1290 Avenue of the Americas, 29th Floor
New York, NY 10104
T. 212.660.3000
F. 212.660.3001

*Attorneys for Plaintiff/Judgment Creditor*

- i -

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS……………………………………………….....................i

TABLE OF AUTHORITIES…………………………………………….……………ii

I.    THE GRYNBERG FUNDS ARE FOR PAYMENT OF
ATTORNEY'S FEES………..……………………………………………………...1

II.   THE PAYMENT TO FRESHFIELDS IS A COMMERCIAL
ACTIVITY IN THE UNITED STATES……………………………………………6

III.  FRESHFIELDS DOES NOT HAVE AN ATTORNEY'S LIEN
AGAINST THE GRYNBERG FUNDS……………………………………………8

CONCLUSION……………………………………………………………………….10

# TABLE OF AUTHORITIES

**Federal Cases**

Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174 (5th Cir. 1989) ......... 7

Corigliano v. Catla Construction Co., 231 F. Supp. 245 (S.D.N.Y. 1964) .................................. 10

EM Ltd. v. Republic of Argentina, 473 F.3d 463 (2d Cir. 2007) ........................................... 1, 2, 3

EM Ltd. v. Republic of Argentina, No. 06 Civ. 7792,
    2010 WL 2399560 (S.D.N.Y. June 11, 2010) ........................................................................ 8

Liberian E. Timber Corp. v. Government of the Republic of Liberia,
    659 F. Supp. 606 (D.D.C. 1987) ............................................................................................ 8

In re Manshul Construction Corp., 225 B.R. 46 (Bankr. S.D.N.Y. 1998) ..................................... 9

NML Capital Ltd. v. Republic of Argentina, No. 03 Civ. 8845,
    2011 WL 1533072 (S.D.N.Y. April 22, 2011) ....................................................................... 8

Petition of Rosenman & Colin, 850 F.2d 57 (2d Cir. 1988) ........................................................... 9

Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992) ....................................................... 7

Rosewood Apartments Corp. v. Perpignano, No. 99 Civ. 4226 (NRB),
    2005 WL 1084396 (S.D.N.Y. May 5, 2005) .......................................................................... 9

United States v. J.H.W. & Gitlitz Deli & Bar, Inc., 499 F. Supp. 1010 (S.D.N.Y. 1980) .............. 9

Walker International Holdings Ltd. v. Republic of Congo, 395 F.3d 229 (5th Cir. 2004) ............ 8

Walters v. Industries and Commercial Bank of China, Ltd., 651 F.3d 280 (2d Cir. 2011) ............ 8

**State Cases**

Cohen v. Cohen, 160 A.D.2d 571 (1st Dep't 1990) ....................................................................... 9

LMWT Realty Corp. v. Davis Agency, 85 N.Y.2d 462 (1995) ..................................................... 10

**Federal Statutes**

28 U.S.C. § 1611(b)(1) ................................................................................................................... 2

**State Statutes**

Section 475 of the New York Judiciary Law ................................................................................. 4, 9

**Federal Rules**

Fed. R. Civ. P. 69 ................................................................................................................................ 10

Plaintiff and Judgment Creditor The Export-Import Bank of the Republic of China ("Ex-Im Bank") respectfully submits this reply in further support of its cross-motion for turnover of funds (the "Turnover Motion"). Grenada has made a vain attempt to evade two simple principles: first, that the funds in question (the "Grynberg Funds" or the "Funds") have been, are, and will be designated and used for the payment of Freshfields' legal fees; and second, that those Funds are used for a commercial purpose in the United States.

Remarkably, at the very time that Grenada argues that the Funds are (somehow) not designated as Freshfields' attorney's fees, Grenada is also asserting Freshfields' bogus claim for an attorney's lien. Their attempt to reconcile these contradictory positions is an "angels dancing on the head of a pin" argument that would make the counsel in Bleak House blush.

Now that Ex-Im Bank has (without the required disclosure by Grenada) found the Grynberg Funds, Grenada has no basis to block their turnover to Ex-Im Bank in very partial satisfaction of its multi-million dollar judgment.

## I.     THE GRYNBERG FUNDS ARE FOR PAYMENT OF ATTORNEY'S FEES

Grenada contends that because the Funds were "frozen" and thus, in their view, "never used", they are necessarily "immune" from restraint by creditor Ex-Im Bank. The argument fails on numerous levels.

We return to EM Ltd. v. Republic of Argentina, 473 F.3d 463, 466 (2d Cir. 2007). There, plaintiff, EM Ltd., a creditor holding a judgment against Argentina, sought to attach certain funds held in an account of the Banco Central de la Republica Argentina ("BCRA"), the central banking authority of the Republic of Argentina (the "Republic"), at the Federal Reserve Bank of New York (the "FRBNY Account"). EM presented a host of complex issues not present here. To name several: the BCRA was a separate juridical entity from the Republic (id. at 465-66), and

there was no judgment against the BCRA[1]; the FRBNY account was the property of the central bank, used for central banking functions, and therefore subject to certain additional FSIA protections; and the alleged "commercial activity" in question pertained to the Republic's repayment of its debt to the International Monetary Fund (id. at 466), which the Court held was not a commercial activity.  Id.  But the Court spoke clearly and emphatically to the "timing" issue, on which Grenada hangs its argument:

> Even if we were to regard repayment of IMF debts as "commercial activity" within the meaning of §§ 1610(a) and (d), we would be required to hold that, on the present record, the FRBNY Funds are not available for attachment under § 1610 because the FRBNY Funds were never "*used for* commercial activity," and plaintiffs presented no evidence to the District Court that the Republic or BCRA intended the FRBNY Funds to be so designated…We need not define the precise contours of "used for" within the contemplation of § 1610 because there is no evidence that either actual use or designation for use occurred here with respect to the FRBNY Funds.  The mere fact that the FRBNY Funds *could have* been used to repay the Republic's debts to the IMF after the Decrees does not, standing alone, render those funds attachable.  See Conn. Bank of Commerce v. Republic of Congo, 309 F.3d 240, 254 (5th Cir. 2002) (noting that the phrase "used for" in § 1610(a) "means what it says: property of a foreign sovereign…may be executed against only if it is 'used for' a commercial activity.")  The plain language of the statute suggests that the standard is actual, not hypothetical use.  See Walker Int'l Holdings Ltd. v. Republic of Congo, 395 F.3d 229, 236 (5th Cir. 2004) (property not "used for" reimbursement of legal expenses where agreements never moved beyond negotiation stage).  Id. at 484-85. (emphasis added)

And the Second Circuit concluded with language that nails the coffin of Grenada's argument:

> "Even if actual use were not required, at least *specific designation for such use* would be necessary.  Cf. Af-Cap Inc. v. Republic of Congo, 383 F.3d 361, 370 (5th Cir. 2004) ("Although …

---

[1] Under the FSIA, foreign central banks are afforded heightened protection from execution. 28 U.S.C. § 1611(b)(1).

>contemplated use is not actual use, it is strongly suggestive that the [funds at issue] were not cordoned off for use of [the state] in its sovereign capacity." Id. at 485 (emphasis added).

Remarkably, in the teeth of EM Ltd.,[2] Grenada says that "the possible future use of sovereign property is irrelevant to the FSIA analysis: the property must *have been used,* at the time of execution, for a commercial activity." Grenada's Reply Brief (Docket #76) ("Gr. Reply"), p. 2 (emphasis in original). As we know from EM, the argument is wrong on the law; it is also wrong on the facts. There is no "possibly" here. Grenada obtained the Arbitration award *for Freshfields' attorney's fees*. It obtained a Southern District of New York Judgment *on that basis*. The Funds came into existence to pay those fees. The Funds were frozen *by Grenada* to assure that very use. After being frozen *by Grenada*, the Funds came into the possession of Grenada. A portion was used to pay Colorado counsel's attorney's fees. Here are the ways in which Grenada has admitted that these Funds have been, and are, "used" and "designated" as legal fees.

1. They were obtained based on Freshfield's assertion of unpaid legal fees in the Arbitration, resulting in a judgment awarded on that basis by the arbitrators. See Phillip Decl., Ex. E. Grenada is judicially estopped from arguing otherwise.

2. Grenada, represented by Freshfields, invoked the processes of this very Court, the Southern District of New York, to confirm its judgment for attorney's fees. Phillip Decl., Ex. G.

3. Grenada obtained its judgment on April 29, 2011, in the Southern District of New York. Id.

4. Grenada then invoked the processes of the Colorado court system to enforce the judgment. Id., Exs H, I. Grenada froze the Funds. Grenada's Memorandum in Support of its Motion (Docket #70) ("Gr. Memo"), p. 5.

---

[2] Grenada has no way to handle EM; its entire discussion of EM in the Second Circuit is at footnote 2 on page 4 of its Reply. There, it "distinguishes" EM with this mysterious comment: "In that case, however, the question was whether two governmental decrees had legally designated particular funds to be used only in a certain manner." How that removes this case from EM's binding doctrine is utterly unclear.

3

5. Once Ex-Im Bank had discovered the effort to collect on the attorney's fees in Colorado, Ex-Im Bank entered into a stipulation with Grenada pursuant to which Grenada deposited the Grynberg Funds with this Court.  Phillip Decl., Ex. J.

6. A portion of the Funds was used to pay Freidel, their local counsel.  Gr. Memo, p. 5.

7. At a hearing on August 10, 2011 before this Court, Mr. Maas said:  "[t]his was, in a sense, a windfall that was to be used to pay the Freshfields law firm, I presume, and was not thought of in any other way."  Summit Decl., Ex. 2, pp. 4-5.

8. And Elliot Friedman, of Freshfields' New York office, was personally in attendance at the hearing, and stated candidly, "We have not been paid, and the sums awarded to Grenada by virtue of the cost awards will inure to us for our legal fees."  Declaration of Courtney Evanchuk ("Evanchuk Decl.") (submitted herewith), Ex. 1, p. 25.

9. And finally - as if all this were not enough - Grenada invokes a (spurious) "attorney's lien" argument to convince this Court that Ex-Im Bank has no right to the Funds.

Grenada has already "used" the Funds for attorney's fees, freezing them and taking possession of them on the basis that they are payment to Freshfields.  But even if this Court were to find, for any reason, that the Funds had not been so "used", the proof is overwhelming that they have been "designated" for attorney's fees.  This is precisely the kind of case contemplated by EM: a case in which the "designation" of funds is beyond any doubt.

What has been said is enough.  Yet there is a further, and dispositive, rejoinder to Grenada's "timing" argument.  In arguing for Freshfields' attorney's lien (see below), Grenada notes that one of the requirements under Section 475 of the New York Judiciary Law is:

"The lien relates back and takes effect from the time the attorney's services were commenced…."  Gr. Memo, p. 9

Another requirement, equally emphasized by Grenada, is:

"The lien attached at the time a verdict, report, decision, judgment or final order is rendered, in the hands of whomsoever the proceeds may come…."  Id.

Grenada then observes that:

"[t]he Funds were secured through the efforts of Freshfields in the Arbitration, and the subsequent enforcement action.  Thus, the lien relates back and takes effect from the time that Freshfield's services were commenced…."  Id.

4

Grenada then concludes that:

> "[t]he lien attached at the latest on February 18, 2011, when Freshfields filed an action to confirm the Award in this court." Id., p. 10.

Indeed, Grenada then argues that the lien actually:

> "relates back and takes effect from the time that Freshfield's services were commenced in the underlying Arbitration." Id., p. 10.

Can Grenada argue with a straight face that there has been no "designation" or "use" of the Funds; and then, that the lien relates back to the commencement of the Arbitration (that is, to approximately January 15, 2010)? See Phillip Decl., ¶ 3.[3]

Finally, consider the underlying reality of Grenada's argument. Grenada froze the Funds. Ex-Im Bank then discovered the Funds, which were on the verge of being executed upon in Colorado. Had Ex-Im Bank not acted, the Funds would have been obtained by Grenada's lawyers in Colorado, and immediately transferred to Grenada (for payment to Freshfields), or directly to Freshfields. Thus, Ex-Im Bank acted (jointly with Freshfields and Mr. Maas' firm) to transfer the funds to this Court, so that this Court could rule on the merits. In Aurelius and EM, by contrast, the funds in question, at the time of restraint, a) had been restrained by the judgment creditors, *not* the sovereign, and b) had no "designation" at all; plaintiffs in both cases had to argue that, despite the general character of the funds restrained, they were going to be put to a certain use. In both Aurelius and EM, the use was resoundingly sovereign and non-commercial: payment of social security, and payment of IMF debt. But the instant case is precisely that

---

[3] Apparently recognizing, rather late, the fatal admission contained in its "attorney's lien" argument, Grenada tries to inoculate itself with its peculiar footnote 5, in which it maintains for the first time that Freshfields actually does *not* have a lien yet; and that it will only *obtain* a lien once this Court rules that the Funds are not immune. This comes as something of a surprise, given Freshfields' consistent representations prior to this moment that Freshfields has a lien. For example, Freshfields' counsel, at oral argument before this Court on August 10, 2011, stating: "the sums awarded to Grenada by virtue of the cost awards will inure to us for our legal fees." Evanchuk Decl., Ex. 1, p. 25. Taking Grenada now at its word, there is indeed no lien possible; see Section 475 of the New York Judiciary Laws, on "relation back" of the lien to "the time the attorney's services were commenced…."

5

contemplated by EM: clearly designated funds, that have been, and will be used, for a commercial purpose.

## II. THE PAYMENT TO FRESHFIELDS IS A COMMERCIAL ACTIVITY IN THE UNITED STATES

The "commercial activity" exception in § 1610(a) of the FSIA provides:

> The property in the United States of a foreign state … used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution …"

The FSIA defines "a commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and *having substantial contact* with the United States." FSIA, § 1603(e). (emphasis added). Grenada states flatly: "[T]he payment of legal fees to Freshfields for its legal services to Grenada in the underlying arbitration which had *no connection to the United States* would not be a use of the Funds for a commercial activity in the United States." (Gr. Reply, p. 2) (emphasis added). Elsewhere, Grenada says: "the possible future use of *sovereign property* is irrelevant to the FSIA analysis…." Id. (emphasis added). We take each proposition in turn.

First, here are the "connections to the United States" that Grenada overlooks:

1. The parties to the underlying petroleum exploration agreement with Grenada were Americans: RSM, and Rachel, Stephen, and Miriam Grynberg. Phillip Decl. Ex. E, p. 1.

2. Those same Americans were claimants in the Arbitration. Id.

3. The American claimants were represented in the Arbitration by U.S. counsel, Daniel L. Abrams. Id., Ex. E.

4. Grenada was *also* represented by U.S. counsel: Brian King and Elliot Friedman, both of the New York office of Freshfields. Phillip Decl., Ex. E. Freshfields U.S. (with its New York address) is listed prominently on the front page of Grenada's objection statement submitted during the arbitration. Id. Ex. C. Finally, the Freshfields invoices for legal fees were issued out of Freshfields' New York office. Id., Ex. D.

5. The substantive claims arose under a U.S.-Grenada treaty. Gr. Reply, p. 5.

6

> 6. The Arbitration was conducted in Washington, D.C. <u>Id.</u>
>
> 7. Once the Arbitration award had been obtained by Grenada against these American parties, Grenada came promptly to the United States to collect. Grenada then evoked the processes of United States courts in the Southern District of New York, and in Colorado, to collect. Phillip Decl., Exs. G-I.

It is frankly absurd to contend, as Grenada does, that there is "no connection to the United States."

On the "sovereign, not commercial" issue, Grenada argues first, that the underlying contract pertained to "sovereign" resources; and second, that, even if the underlying contract were commercial, that would be irrelevant, because the Arbitration itself is not commercial. Both arguments are wrong.

As to the first, Grenada cites <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 614 (1992), but misapprehends its significance. <u>Weltover</u> stated:

> When a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.

There is nothing inherently "sovereign" about natural resources, no matter how many times Grenada uses the word "sovereign." Grenada says that "the granting of exploration rights over natural resources is a sovereign…activity rather than something a private party could do…." (Gr. Reply, p. 5). That would come as a surprise, for example, to the Texas oil industry, which buys and sells thousands of leases a day for oil exploration in Texas.

And the case law goes directly against Grenada. In <u>Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.</u>, 875 F.2d 1174 (5th Cir. 1989), the underlying activity was oil drilling off the coast of Brazil. Grenada would have this Court believe that that is necessarily an inherently "sovereign" activity. Yet the Court in <u>Atwood</u> found that letters of credit in the United States that pertained exclusively to the oil well drilling off the coast of Brazil were

7

"commercial." How could that be, if oil drilling is inherently "sovereign"? Similarly, in <u>Walker International Holdings Ltd. v. Republic of Congo</u>, 395 F.3d 229, 235 (5th Cir. 2004), the Court stated flatly that oil exploration was commercial activity. So Grenada is simply wrong that oil exploration is somehow uniquely sovereign.[4]

Grenada says that its payment to Freidel of a portion of the Grynberg Funds does not "constitute commercial activity of the sort that deprives an immune fund of its immunity." Gr. Reply, p. 6. But the payment to Freidel denotes exactly "the essential character of the use of the funds in question." <u>Liberian E. Timber Corp. v. Gov't of the Republic of Liberia</u>, 659 F. Supp. 606, 610 (D.D.C. 1987). Grenada has already used a portion of the Grynberg Funds to pay attorney's fees, and intends (by its own admission) to use the remainder of the funds to pay attorney's fees. Thus, the relatively small payment to Freidel is of exactly the same character of the use of the remainder of the Grynberg Funds.

### III. FRESHFIELDS DOES NOT HAVE AN ATTORNEY'S LIEN AGAINST THE GRYNBERG FUNDS

Grenada (or, really, Freshfields) has an empty hand on its supposed attorney's lien.

In our main brief, we showed that a *mandatory* prerequisite for an attorney's lien is that the client has been placed in a *better* position than it was in prior to the commencement of the

---

[4] Grenada's reliance on <u>Walters v. Indus. and Commercial Bank of China, Ltd.</u>, 651 F.3d 280, 297 (2d Cir. 2011), is unavailing. There, a judgment creditor could not demonstrate that property was used for commercial activity in the United States where the judgment creditor failed to specify any property on which it sought to execute. <u>Id.</u> Here, Ex-Im Bank has clearly identified the Grynberg Funds. <u>NML Capital Ltd. v. Republic of Argentina</u>, No. 03 Civ. 8845, 2011 WL 1533072 (S.D.N.Y. April 22, 2011) does not help its case, either. In <u>NML</u>, the sole issue was whether a state-owned company was part of the Republic, or a separate legal entity for purposes of the FSIA. <u>Id.</u> at *5. In passing, the court noted that the property at issue, navigational control parts, were being constructed at the time of the decision and therefore were not used for commercial activity. Here, where the asset at issue is the Grynberg Funds, which were frozen *by Grenada* on the explicit basis that they were to be used to pay US lawyers, <u>NML</u> is inapplicable. Grenada's reliance on <u>EM Ltd. v. Republic of Argentina</u>, No. 06 Civ. 7792, 2010 WL 2399560 (S.D.N.Y. June 11, 2010), is another dead end. In <u>EM Ltd.</u>, the court found that funds that had been frozen for approximately three years before the judgment creditor sought to execute on them were not used for commercial activity under the FSIA. <u>Id.</u> at *4. Here, Ex-Im Bank only learned of the existence of the Grynberg Funds after Grenada (1) obtained entry of the underlying Arbitration award, and then (2) restrained the Grynberg Funds. Ex-Im Bank then moved promptly to obtain the Funds.

litigation by virtue of the attorney's efforts.  The lien exists only where an attorney in an action has obtained for the client "money or property which [the client] did not possess before the attack was made and repulsed."  Petition of Rosenman & Colin, 850 F.2d 57, 61 (2d Cir. 1988).

That simple proposition defeats Grenada.  The award of attorney's fees by the arbitrators did nothing but restore Grenada to "status quo ante"; that is, to precisely its position *before* the Grynberg parties brought an arbitration against Grenada.  Put differently, a defendant's attorney cannot obtain an attorney's lien "unless the client asserts a counter-claim."  In re Manshul Constr. Corp., 225 B.R. 46, 50 (Bankr. S.D.N.Y. 1998).[5]

Grenada has no response to this principle fatal to its claim.  Thus, it resorts to obfuscation.  It relies on the term "affirmative recovery", ignoring the clear meaning of this term under Rosenman: an "affirmative recovery" that puts the client in a *better position* than it had prior to the litigation.  Grenada also pleads, without authority, that attorney's fees should be treated specially.  The closest Grenada comes to a case on attorney's fees is Cohen v. Cohen, 160 A.D.2d 571 (1st Dep't 1990).  There, the Court did conclude that a recovery of attorney's fees could be subject to a lien.  Unfortunately for Grenada, that was a *plaintiff's* recovery of attorney's fees; a successful *plaintiff* had been placed in a better position as a result of the efforts of his attorney than he had been in when he began the litigation.  Unfortunately for Grenada, defendants must assert a successful counter-claim to create a lien.[6]

---

[5] See also Rosewood Apartments Corp. v. Perpignano, No. 99 Civ. 4226 (NRB), 2005 WL 1084396, at *3 (S.D.N.Y. May 5, 2005) (assertion of a claim is a prerequisite to an attorney's lien); United States v. J.H.W. & Gitlitz Deli & Bar, Inc., 499 F. Supp. 1010, 1014 (S.D.N.Y. 1980) ("New York courts have held that an attorney is not entitled to the benefits of section 475 unless he has commenced an action or asserted a counterclaim on behalf of his client").

[6] Grenada's attempt to distinguish international arbitration from domestic litigation is unavailing.  New York law applies to the attorney's lien issue, and "New York law is clear … that the representation of a defendant in resisting a claim against him does not invoke the protection of an attorney's lien under section 475 unless a counterclaim is asserted."  J.H.W. & Gitliz Deli & Bar, Inc., 499 F. Supp. at 1014.

9

Grenada does not like the law, but it is limpidly clear.[7]

Freshfields never asserted a claim or counterclaim on behalf of Grenada in the underlying Arbitration. The Arbitration award merely restored Grenada to the *status quo ante*. Thus, under New York law, Freshfields does not have an attorney's lien against the Grynberg Funds.

### Conclusion

For the foregoing reasons, Ex-Im Bank requests that the Court:

    A.    Deny Grenada's Motion in its entirety;

    B.    Grant Ex-Im Bank's Turnover Motion and order the immediate turnover of the Grynberg Funds to Ex-Im Bank;

    C.    Issue a writ of execution pursuant to Fed. R. Civ. P. 69;

    D.    Order an execution under § 1610(c) of the Foreign Sovereign Immunities Act in the form of the Proposed Order submitted with the Turnover Motion; and

    E.    Grant such other relief as it deems proper.

Dated: New York, New York        SULLIVAN & WORCESTER LLP
       March 28, 2012

By: /s/ *Paul E. Summit*
    Paul E. Summit
    Andrew T. Solomon
    Courtney Evanchuk
1290 Avenue of the Americas, 29th Floor
New York, NY 10104
T. 212.660.3000
F. 212.660.3001

*Attorneys for Plaintiff/Judgment Creditor*

---

[7] LMWT Realty Corp. and Corigliano, relied on by Grenada, are merely plain vanilla cases in which the plaintiffs achieved victories that created funds leaving their plaintiff clients in a better position than they were in before the litigations commenced. LMWT Realty Corp. v. Davis Agency, 85 N.Y.2d 462, 465-68 (1995); Corigliano v. Catla Constr. Co., 231 F. Supp. 245, 247, 249-51 (S.D.N.Y. 1964).