UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

| | | |
|---|---|---|
| THE EXPORT-IMPORT BANK OF THE REPUBLIC OF CHINA, | : : : | 06CV 2469 (HB) (AJP) |
| Plaintiff/Judgment Creditor, | : | **ORAL ARGUMENT REQUESTED** |
| -against- | : | |
| | : : | |
| GRENADA, | : : | |
| Defendant/Judgment Debtor. | : | |

--------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO JOINT MOTION TO VACATE RESTRAINING NOTICES; AND IN SUPPORT OF CROSS-MOTION FOR DISCOVERY AND TURNOVER OF RESTRAINED FUNDS**

SULLIVAN & WORCESTER LLP
Paul E. Summit
Andrew T. Solomon
Courtney Evanchuk
1290 Avenue of the Americas, 29th Floor
New York, NY 10104
T. 212.660.3000
F. 212.660.3001

*Attorneys for Plaintiff/Judgment Creditor*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

PRELIMINARY STATEMENT ..................................................................................... 1

THE LAW ON THE INDEPENDENCE OF "INSTRUMENTALITIES OF A FOREIGN
    STATE" .................................................................................................................... 3

EX-IM BANK IS CLEARLY ENTITLED TO DISCOVERY ....................................... 5

THERE IS NO "THRESHOLD ISSUE" FOR DETERMINATION ........................... 11

THE PROPERTY IS NOT IMMUNE ......................................................................... 14

THE PROPERTY IS "USED FOR A COMMERCIAL ACTIVITY" ......................... 14

THE COMMERCIAL ACTIVITY IS "IN THE UNITED STATES" ......................... 16

CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

Cases

Cargill, Inc. v. Sabine Trading and Shipping Co., Inc.,
    756 F.2d 224 (2d Cir. 1985)................................................................................................. 12

First Nat'l City Bank v. Banco Paralel Comercio Exterior de Cuba,
    462 U.S. 611 (1983)............................................................................................... passim

JSC Foreign Econ Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,
    295 F. Supp. 2d 366 (S.D.N.Y. 2003)............................................................... 13, 14

Kalamazoo Spice Extraction Co. v. The Provisional Military Gov't of Socialist Ethiopia,
    616 F. Supp. 660 (W.D. Mich. 1985) ........................................................................... 5

McKesson Corp. v. Islamic Republic of Iran,
    52 F.3d 346 (D.C. Cir. 1995) ........................................................................................ 5

NML Capital, Ltd. v. The Republic of Argentina,
    --- F.3d ----, 2012 WL 1059073 (2d Cir. March 30, 2012)...................................... 15

Republic of Argentina v. Weltover, Inc.,
    504 U.S. 607 (1992).............................................................................................. 14, 15

Texas Trading & Mill Corp. v. Federal Republic of Nigeria,
    647 F.2d 300 (2d Cir. 1981)......................................................................................... 15

Trans Commodities, Inc. v. Kazakstan Trading House, S.A.,
    1997 WL 811474 ......................................................................................................... 13

USA Auto Funding, LLC v. Washington Mut., Inc.,
    No. 16440/05, 2006 WL 1493115 (Sup. Ct. Nassau County Mar. 30 2006)........... 12

Statutes

28 U.S.C. § 1603(d) ............................................................................................................. 15

28 U.S.C. § 1610(a) ............................................................................................................. 14

28 U.S.C. § 1610(c) ...................................................................................................... 12, 13

CPLR § 5222.......................................................................................................... 1, 12, 14

CPLR 5222(b) ...................................................................................................................... 12

CPLR § 5225(a) ................................................................................................................. 1, 2

CPLR 5230............................................................................................................................ 12

Rules

Fed. R. Civ. P. 69(a) .................................................................................................................... 1

Plaintiff and Judgment Creditor The Export-Import Bank of the Republic of China ("Ex-Im Bank") hereby opposes the Joint Motion brought by Defendant/Judgment Debtor Grenada ("Grenada"), and interveners Grenada Airports Authority, Aviation Services of Grenada Ltd., Grenada Ports Authority, National Water and Sewage Authority of Grenada, and Grenada Solid Waste Management Authority (collectively, "the Grenada Entities" and together with Grenada, "the Joint Movants").  The Joint Movants seek an order vacating or modifying certain restraining notices (the "Restraining Notices") served by Ex-Im Bank on various entities (the "Restrained Entities") pursuant to New York Civil Practice Law and Rules ("CPLR") § 5222.  This Memorandum is also submitted in support of Ex-Im Bank's Cross-Motion for Discovery; and for Turnover of the funds restrained by the Restraining Notices (the "Restrained Funds") to Ex-Im Bank (the "Cross-Motions").

In sequence, this Court should first grant Ex-Im Bank's Cross-Motion for Discovery, in order to permit discovery that (as demonstrated below) is absolutely required to determine all issues pertaining to these motions and cross-motions.  Once that discovery is completed, Ex-Im Bank will demonstrate that the Joint Motion should be denied in its entirety; and that the Restrained Funds should be turned over to Ex-Im Bank in partial satisfaction of its judgment against Grenada, pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5225(a).

## PRELIMINARY STATEMENT

Grenada defaulted on four multi-million dollar loans made to Grenada by Ex-Im Bank between 1990 and 2000.  On March 16, 2007, this Court entered an Amended Judgment in favor of Ex-Im Bank and against Grenada in the amount of $21,586,057.38, plus prejudgment interest, attorneys' fees, and statutory interest.  With post judgment interest, the judgment now stands in excess of $32,000,000.

Although five-plus years have passed since the judgment, Grenada still has not paid anything to Ex-Im Bank in satisfaction.[1]  Instead, Grenada has, on numerous occasions, failed to respond to lawful discovery requests, or "complied" at a snail's pace.  It has also failed to disclose assets located *in the United States* notwithstanding court orders.[2]

Beginning on September 13, 2011,[3] Ex-Im Bank began to serve restraining notices in New York on cruise ship companies and airlines doing business with Grenada (the "Restraining Notices").[4]  Pursuant to the requirements of CPLR § 5225(a), these Restraining Notices stated that the Restrained Entities

> may owe a debt to the judgment debtor, Grenada, or may be in possession or in custody of property in which the judgment debtor has an interest.

Each Restraining Notice stated that the recipient was

> forbidden to make…any…assignment [or] transfer…[of] the judgment debtor's property that may be in [their] …possession, to any person other than the…marshal except upon direction of the…marshal, or pursuant to an order of the court….

Every time a Restraining Notice was served, notice was simultaneously given to counsel for Grenada.

For over six months, the Restrained Entities have, we believe, generally complied with their lawful obligations.  Almost $200,000 has been deposited into the Court by one of the

---

[1] The only payment Grenada has made to Ex-Im Bank since the Amended Judgment was issued is $10,000.00 in attorney's fees, ordered on March 24, 2009, as a sanction for forcing needless motion practice, and finally paid on September 22, 2011 after a further court order.  See Docket No. 22.

[2] Now fully briefed (but not yet argued) before this Court is the set of motions and cross-motions over the so-called "Grynberg Funds."  See Docket Nos. 68-70, 72-74, and 76.  These are assets that had to be disclosed (by Court Order) to Ex-Im Bank by Grenada, but were *not* disclosed; Ex-Im Bank discovered them through its own diligence, and is now seeking their turnover.

[3] Not October 2011, as the Joint Movants state.  See Joint Memorandum of Law to Vacate Restraining Notices (the "Joint Memorandum")(Docket No. 78) at p. 3.

[4] Identification of Restrained Entities can be found in Exhibits A through L to the Steven D. Greenblatt Affidavit.

Restrained Entities, and another will be depositing funds shortly;[5] other Restrained Entities have chosen not to do that, but have (we believe) ceased paying Grenada various obligations that these Restrained Entities would otherwise be required to pay Grenada.

And, for over six months, *neither Grenada nor any of the Government Entities took any action* in connection with these Restraining Notices.  Now, Grenada and the Government Entities have brought their Joint Motion, contending that the Restraining Notices should be vacated.  By the terms of the Foreign Sovereign Immunities Act ("FSIA") and the relevant case law (discussed below), one of the questions to be determined by this Court is the independence, or lack thereof, of the Government Entities from Grenada.  That is why the Joint Movants filed extensive affidavits of government officials and lawyers acting on their behalf—and why discovery for Ex-Im Bank is essential.

## THE LAW ON THE INDEPENDENCE OF "INSTRUMENTALITIES OF A FOREIGN STATE"

The seminal case is First Nat'l City Bank v. Banco Paralel Comercio Exterior de Cuba, 462 U.S. 611 (1983).  There, the United States Supreme Court refused to accept the "separateness" of a supposed independent entity of the Cuban Government, the Banco Paralel Comercio Exterior de Cuba ("Bancec"), for purposes of satisfaction of a judgment.  Bancec  has a number of important guiding principles.

First, the Court considered what law would apply to the decision on Bancec's separate juridical status.  The Court noted that

> the law of the state of incorporation normally determines issues relating to the *internal affairs of a corporation*.

---

[5] On January 17, 2012 and March 7, 2012, Grenada and Ex-Im Bank entered into stipulations by which two of the Restrained Entities, Virgin Atlantic and British Airways PLC, have deposited or will deposit restrained funds directly to this Court.  See Exhibits A and B to the accompanying Declaration of Paul E. Summit, dated April 3, 2012 (the "Summit Decl.").

Id. at 621(emphasis in original).

But

> different conflicts principles apply…when rights of third parties
> *external* to the corporation are at issue.

Id. (again, emphasis in the original).

Thus the Court concluded that United States federal common law would govern.  Id. at

622-623.[6]

The Court concluded that a presumption of independent status should be afforded to

instrumentalities of a foreign state, but emphasized that the "presumption may be overcome" (as

it was in Bancec).  The Court noted that

> Where a corporate entity is so extensively controlled by its owner
> that a relationship of principal and agent is created, we have held
> that one may be held liable for the actions of the other…

Id. at 629.

The Court went on to say:

> Our cases have long recognized the broader equitable principle that
> the doctrine of corporate entity, recognized generally and for most
> purposes, will not be regarded when to do so would work fraud or
> injustice….

Id.

And it cited favorably a case of the International Court of Justice, Case Concerning The

Barcelona Traction, Light & Power Co., 1970 I.C.J. 3:

> The wealth of practice already accumulated on the subject in
> municipal law indicates that the veil is lifted, for instance, to
> prevent misuse of the privileges of legal personality, as in certain
> cases of fraud or malfeasance, *to protect third persons such as a*

---

[6] Curiously, the Joint Movants rely on a 1949 case from the United Kingdom: Tamlin v. Hannaford [1949], All ER 327, 328-329.  Suffice it to say that a) the Joint Movants have not even demonstrated that the law of the UK controls in Grenada; b) even if it does, neither the UK nor Grenada's law governs this question, see Bancec; c) Joint Movants are relying on the vitality of a 63 year old case; and d) Bancec specifically rejected British law as guidance. Bancec at n. 18.

> *creditor or purchaser,* or to prevent the evasion of legal
> requirements or obligations…

Id. at 630.[7]

Finally, the Court declined to accept as a standard whether the instrumentality performs a "governmental function."

> We decline to adopt such a standard in this case, as our decision is
> based on other grounds.  We do observe that the concept of a
> "usual" or a "proper" governmental function changes over time
> and varies from nation to nation….

Id. at n. 27.

These are the fundamental principles that govern the "separateness" inquiry.  And they are intensely fact-based.[8]

## EX-IM BANK IS CLEARLY ENTITLED TO DISCOVERY

Ex-Im Bank is entitled to discovery for its Opposition to this Joint Motion.[9]

The Joint Movants filed the affidavits of the following individuals:

1.   Dickon Mitchell, a lawyer whose firm has represented the various entities for many years.  Attached to the Mitchell Affidavit  (Docket No. 80) (the "Mitchell Aff.") as Exhibits A

---

[7] Unless otherwise indicated, all emphasis is supplied.

[8] Thus, each case to some extent "stands on its own."  However, two cases are of particular note.  In McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346 (D.C. Cir. 1995), the court found that Iran exercised sufficient control over a dairy to create a principal agent relationship.  Central to its finding was the government's control over six out of seven seats on the dairy's Board of Directors; the government's control over 52% of the dairy's stock; and the conflation of the aims of the government with the aims of the dairy.  52 F.3d at 351.  In Kalamazoo Spice Extraction Co. v. The Provisional Military Gov't of Socialist Ethiopia, 616 F. Supp. 660, 666 (W.D. Mich. 1985), the court rejected supposed "separate juridical personalities" of the government and a "private" company based on the ability of the government to a) appoint a majority of the board of directors of the "private company"; b) approve all checks issued by the company in excess of $25,000; and c) approve certain invoices issued by the company.  Given the fact-based nature of cases such as Bancec, McKesson, Kalamazoo, and the other cases cited in the Joint Motion, discovery appears to be universally granted.

[9] The position of the Joint Movants, as we understand it, is that Ex-Im Bank is entitled to discovery, but only after some preliminary threshold determination by this Court as to the propriety of the Restraining Notices.  They have no basis for such a cumbersome bifurcated procedure.  See discussion *infra*.

through D are the Grenadian statutes which, he says, authorize and regulate the various

Government Entities (the "Authorizing Statutes").

    2.    Rodney George, Chairman of the Grenada Airport Authority ("GAA").

    3.    Terrence Smith, Chairman of the Board of Directors of the National Water and

Sewer Authority ("NWSA").

    4.    Ambrose Phillip, General Manager of the Grenada Ports Authority ("GPA").

    5.    Karen Roden-Layne, General Manager of the Grenada Solid Waste Management

Authority ("GSWMA").

    6.    Leslie Scott, General Manager of Aviation Services of Grenada ("AS").

    The Joint Motion Memorandum states sweepingly:

> The involvement of the Government of Grenada in the affairs of
> each Statutory Corporation is *minimal*, and is largely a high-level
> oversight role with respect to general policy and macro-level
> finance matters.

Joint Memorandum at p. 6.  But the Authorizing Statutes tell a very different story.

    Consider, for example, the Authorizing Statute concerning the GAA, the <u>Airports</u>

<u>Authority Act</u>, Revised Laws of Grenada (1990), <u>see</u> Mitchell Aff., Exhibit A.  A Grenada

government "Minister" is assigned to be "responsible for civil aviation."  <u>Airports Authority Act</u>,

Chapter 12, ¶ 2 at p. 3.  The Minister has the following powers:

    1.    He can transfer the ownership of government property to the GAA "that seems to him

necessary or desirable to enable the [GAA] to carry out its function…."  <u>Id</u>. § 5-2 at p. 4.

    2.    He determines the salaries of the General Manager and the Airport Superintendents of

the GAA.  <u>Id</u>. § 6-2 at p. 4.

    3.    He sets policy for the GAA.  Id. § 5-3 at p. 4.

    4.    He sets pensions and benefits for the GAA.  Id. § 9 at p. 5.

5.   He approves all borrowing of the GAA. Id. §15-2 at p. 7.

6.   He approves all investments of the GAA. Id. § 16 at p. 7.

7.   He supervises all accounts of the GAA.  Id. § 17-1 at p. 7.

8.   He writes off bad debts of the GAA.  Id. § 19 at p. 8.

9.   He approves all regulations for the management, control and supervision of airports of the GAA. Id. § 23 at p. 9.

10. He appoints the members of the Board of Directors. Id. § 3-3, First Schedule: 1-2 at p. 12.

11. He appoints the Chairman of the Board.  Id. § 3-3, First Schedule: 3 at p. 12.

12. He can "revoke the appointment of a Director if he considers it expedient so to do." Id. § 3-3, First Schedule: 6 at p. 13.

This is "*minimal*" involvement? These would appear to be sweeping powers, putting the Minister in control of everything from "macro" to "micro"!

As to the National Water and Sewerage Authority ("NWSA"), the Authorizing Statute, the National Water and Sewerage Authority Act, Grenada Act No. 25 of 1990, demonstrates similar domination and control by Grenada.  See Mitchell Aff., Ex. B. Grenada established the NWSA to "promote a national policy for its Water and Sewerage in Grenada…."  National Water and Sewerage Authority Act, Part II, § 3 at p. 131.  The Board of Directors consists of a Chairman and a Deputy Chairman, both nominated by the Minister responsible for the NWSA; four Directors nominated  by the Ministries of Agriculture, Health, Works, and Finance; two Directors nominated by the Minister responsible for the NWSA; and, finally, one Director *not* nominated by the Government.  But even as to that last, all the Directors "shall be appointed by the Cabinet."  Id., Part III, § 8 at p. 136.  All salaries of the Board are approved by the Minister.

Id., Part III, ¶ 8(3) at p. 137.  The Board of Directors, "with the *approval* of the Minister

*signified in writing*", then appoints the Manager and Deputy Manager.  Id., Part III, § 9 at p. 137.

The Minister (and only the Minister) can declare areas of Grenada to be "protected areas." Id.,

Part IV, § 21 at p. 144.  The Minister approves the budget every year (Id., Part VI, § 25 at p.

147); receives statements of accounts duly audited and certified (Id., Part VI, § 26 at p. 146); and

appoints and approves accountants to audit and report (Id., Part VI, § 26(6) at p. 148).

 As if all this were not domination enough, the Statutory Authority gives the Minister the

following powers:

> The Minister may, after consultation with the Board, give to the
> Board *general guidelines or guidelines of a specific nature* relating
> to the policy of the Government with regard to water supply and
> sewerage disposal; and *the Board shall be obliged to follow such
> guidelines* in the performance of the functions of the authority.

Id., Miscellaneous, § 50 at p. 166.

 And the Statutory Authority adds:

> The Authority may, with the approval of the Minister, and subject
> as directed by the Minister, make regulations *generally* for the
> purposes of this act *and in particular* in relation to the following
> matters….

Id., Miscellaneous, § 52(1) at p. 167.

 What then follows are a list of areas of regulation from (a) through (w) that embrace the

entire scope of the agency.  Id., Miscellaneous, §§ 50-52 at pp. 166-170.

 Then we find the stern direction of § 52(3) at p. 170:

> If within three months after being directed by the Minister to make
> regulations the Authority fails to make regulations in relation to all
> or any of the matters specified in such direction *the Minister may
> revoke such directions and may make regulations as he considers
> necessary*.  While such regulations by the Minister are in force, the
> Authority may not make any request on any matter covered by the
> regulations made by the Minister.

> Regulations made by the Minister under subsection (3) of this
> section shall have effect as if they had been made by the Authority.

> Regulations made under this section *shall bind the Government*.

Id., Miscellaneous, §52(3) at p. 170.

The Affidavits struggle to play down these plenary powers.  For example, Mr. Mitchell,

the counsel to the GAA, states that

> Ministers, for example, are permitted to offer general policy
> guidance to each Statutory Corporation, but each Statutory
> Corporation's board and executives are empowered to take all such
> actions as they in their own judgment determine will best
> effectuate their respective missions….

Mitchell Aff. ¶ 8.

Thus Mr. Mitchell seems to directly contradict the ministerial *mandates* set forth in the

GAA and other Authorizing Statutes.[10]  As "support" for his statement, Mr. Mitchell cites to the

Authorizing Statutes for each Government Entity, including the GAA's Authorizing Statute (Ex.

A).  He points to § 5(3) there; but what that paragraph actually says is:

> The Minister, after consulting with the Chairman of the Board of
> Directors, may issue directions in writing of a general character
> concerning matters of policy to be observed by the Authority.

Or consider, for example, the Affidavit of Rodney George, Chairman of the GAA:

> Given that the GAA [the Grenada Airport Authority] was created
> by the government and is tasked with operating Grenada's Public
> Air Transport System, the government of Grenada naturally has
> some high-level involvement with the GAA, mainly with respect to

---

[10] Mr. Mitchell is merely identified in his affidavit as an attorney of Grenada; and a partner in a law firm there, Grant, Joseph & Co., that has for many years represented "various corporate entities created by the Government of Grenada pursuant to enabling legislation, including the Grenada Airports Authority ("GAA")".  He says he has been "actively involved in such matters" since joining the firm in 2002. The affidavit provides essentially nothing as to why Mr. Mitchell should be regarded as some sort of expert on the "day to day" affairs of the various Government Entities, most of which he has apparently never represented, except the general statement that he is "knowledgeable about the manner in which the Statutory Corporations operate." See Mitchell Aff. ¶ 2. While he has apparently been involved with the GAA, there is no indication that he has had any involvement with the other so-called Statutory Corporations.  Thus, it is entirely unclear on what basis he makes his sweeping (and dubious) statement that "the involvement of the Government of Grenada in the affairs of each Statutory Corporation is minimal…."  Id.

9

> the appointment of the members of the GAA's Board of Directors, the provision of general policy guidance to the GAA, approval of major financial endeavors affecting the GAA, and, in an auditing and oversight capacity with respect to the GAA's financial statements and budgeting process…

See Declaration of Stephen D. Greenblatt, dated March 20, 2012 (Docket No. 79) (the "Greenblatt Decl.), Ex. M, ¶ 11.  In reality, as we know from the Authorizing Statute, the Minister is supposed to set *all* policy; approve *all* financial endeavors; appoint and fire *all* members of the Board; etc.  Discovery is absolutely essential on these questions.

And there are other open factual questions as well.  One is the fundamental issue of whether, indeed, the Restrained Entities are withholding monies from the Government Entities, or from Grenada (assuming such a distinction can even be made).  Princess Cruises, for example, stated on March 27, 2012 that

> Since October 11, 2011….Princess has suspended payments *to the government of Grenada*.

Summit Decl., Exhibit C.

Also, in the stipulation governing Virgin Atlantic's deposit to the Court, Grenada agreed that

> Virgin Atlantic makes monthly payments *to Grenada or its agents*….[11]

Summit Decl., Exhibit A at p. 1.

Moreover, the Affidavits filed by the Joint Movants are coy on whether the Restrained Entities owe money to Grenada.  For example, Terrence Smith, the Chairman of the Board of Directors of the National Water and Sewage Authority ["NWSA"], states:

> Whatever interest the government of Grenada may or may not have in property held by the Cruise Lines (and I am *presently unaware*

---

[11] Bancec states clearly that a "principal-agent" relationship would defeat corporate separateness.  462 U.S. at 629.

> *of any such interest*), it has no such interest in the Water Levies
> due to the NWSA from any of them….

<u>See</u> Greenblatt Decl., Ex. N, ¶ 5.

Similar statements can be found in the other Affidavits.[12]  And Grenada itself, even though a party to the Joint Motion, has submitted no proof  that the Restrained Entities do not owe it any money directly.

The Affidavits are also peculiarly silent on how much money is being withheld by the Restrained Entities from the Government Entities, and as to which categories of fees and payments.  This is information directly in the control of the Government Entities, of course.  All of this suggests, at the very least, numerous open and vital questions for discovery.[13]

It is simply beyond any reasonable dispute that Ex-Im Bank is entitled to discovery.  We have attached here initial discovery instruments addressed to the Government Entities and the respective Ministers.  (Summit Decl., Exs. D and E).  We commit to the Court that we shall cooperate fully with counsel for the Joint Movants, and proceed as rapidly as we can to complete the discovery.[14]

## <u>THERE IS NO "THRESHOLD ISSUE" FOR DETERMINATION</u>

The Joint Movants argue in a footnote that

---

[12] <u>See</u>, for example, the Affidavit of Ambrose Phillip, General Manager of the Grenada Ports Authority: "Whatever interest the government of Grenada *may or may not have* in property held by these restrained entities, it has no such interest in the Port Charges…." Greenblatt Decl., Ex. O, ¶ 7.

[13] Joint Movants claim that their "grounds for modification or vacatur … would apply to any Restraining Notice served on any Restrained Entity that owes payments to a Statutory Corporation."  Thus they "seek modification or vacatur of any…restraining notices of which they are not presently aware that similarly attempt to restrain any property or assets of the Statutory Corporations." Joint Memorandum at p. 3, n. 2. These requests should be denied.  First, the Statutory Corporations surely know who is paying them, and who is not, so all the information that they needed to be specific has been in their control.  As if that were not enough, Ex-Im Bank has given Grenada notice every time a Restraining Notice has been served.

[14] We have proposed an efficient schedule of depositions commencing on May 1, which should give the Interveners time to gather and produce documents.

the Restraining Notices were improperly issued by EX-IM without according
Grenada the procedural protections it, as a sovereign nation, is entitled to under
the FSIA with respect to judgment enforcement efforts.

Joint Memorandum at p. 20, n. 12.

The argument is just wrong. §1610 (c) states:

No *attachment or execution* referred to in subsections (a) and (b) of this section
shall be permitted until the Court has ordered such *attachment and execution* after
having determined that a reasonable period of time has elapsed following the
entry of judgment and the giving of any notice required under Section 1608 (e) of
this chapter.

By its plain language §1610 (c) does not apply to restraining notices under CPLR 5222.

It applies to "attachments" and "executions". A restraint under CPLR 5222, however, is not an

attachment. First, unlike restraints, attachments provide a lien on assets. USA Auto Funding,

LLC v. Washington Mut., Inc., No. 16440/05, 2006 WL 1493115, *1 (Sup. Ct. Nassau County

Mar. 30 2006). Second, unlike restraints, attachments provide *quasi in rem* jurisdiction, see

Cargill, Inc. v. Sabine Trading and Shipping Co., Inc., 756 F.2d 224 (2d Cir. 1985). Third, in

attachment proceedings (Article 62 of the CPLR), the attached property must be located in New

York; with Article 52 restraining notices, *in personam* jurisdiction over the restrained entity

provides the basis for restraining funds outside of New York. See Commentary on Article 62,

Section 6202, by Vincent C. Alexander (McKinney's 7B at p. 61-62). Fourth, restraining

notices, unlike attachments, last a year only (CPLR 5222(b)).

Nor are restraints "executions." As Siegel states in his CPLR commentary on restraining

notices:

Under the CPLR…the restraining notice, whatever its uses and advantages, gives
the judgment creditor *no lien* on the defendant's property…and *no special priority*
in a race with other judgment creditors…. [A]fter the restraint is issued and served
and hence made effective immediately, the judgment creditor should promptly
turn attention *to the concurrent use of one of the lien-giving devices.* The mere
delivery of an *execution*, for example (CPLR 5230), to the appropriate sheriff will

obtain a quick priority, or 'lien', on the debtor's personal property even before the execution is levied.

Siegel's N.Y. Practice at C5222:8.

Thus, Section 1610 (c) does not apply to restraints.[15]  Even if it did, however, the simple remedy would be for the Court, now, to authorize the restraints prospectively.  Ex-Im Bank could then re-serve the restraints immediately and effectively restrain the same assets that are currently subject to the existing restraints.[16]

In a separate footnote, the Joint Movants make another stab at articulating some "threshold" requirement, stating that

Ex-Im's failure to precede issuance of the Restraining Notices with an adjudication of the Statutory Corporations' potential alter ego liability is an independent reason for immediately vacating the Restraining Notices….

Joint Memorandum at p. 13, n. 8.

They rely on JSC Foreign Econ Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc., 295 F. Supp. 2d 366 (S.D.N.Y. 2003).  But JSC addressed a totally different procedural landscape.  In JSC (a diversity jurisdiction case decided without reference to the FSIA), plaintiff obtained arbitration awards against defendant IDTS.  Plaintiff failed to collect on the judgment, and the case was administratively closed.  Four and a half years later, plaintiff filed a new complaint against IDTS and two new defendants, Reich and Jossem.  Before obtaining judgment against Reich and Jossem, plaintiff sought a *preliminary injunction* against Reich and Jossem, preventing them from disposing of certain assets.  295 F. Supp. 2d at p. 370.  Plaintiff claimed no

---

[15] In a footnote, interveners cite a single, unreported decision for the proposition that "restraints" are covered by 28 U.S.C. § 1610(c): Trans Commodities, Inc. v. Kazakstan Trading House, S.A., 1997 WL 811474, No. Civ. 9782(BSJ) (S.D.N.Y. May 28, 1997).  There the Court did, indeed, hold that 28 U.S.C. § 1610(c) applied to restraining notices, but the Court simply assumed that "attachment" in the statute covered restraints.  The Court did not provide any discussion or rationale for why that is so.  It appears, at least from the brief decision, that the parties never even raised the issue.

[16] Even if the restraints were now "ordered" by this Court, nothing would change with regard to the Restrained Funds already withheld by the Restrained Entities.  Whatever monies have already been withheld would still constitute restrainable debts, and thus would remain subject to the restraints.

lien or equitable interest in the assets plaintiff sought to enjoin, and for this reason (among others) the preliminary injunction was denied. Plaintiff had also issued restraining notices pursuant to CPLR Section 5222 on Reich, Jossem, and entities believed to hold assets of Reich and Jossem.  The Court vacated the restraining notices; in the words of the Court, restraining notices "may not be used as an end-run around the requirements of the prejudgment attachment statutes…."  295 F.Supp. 2d at 393.[17]

## THE PROPERTY IS NOT IMMUNE

Joint Movants argue briefly that none of the funds restrained are "used for a commercial activity in the United States", as required by 28 U.S.C. Section 1610(a).  They contend that the restraints fail both prongs of the test (i.e., "commercial activity" and "in the United States.").  Joint Movants are wrong on both counts.

## THE PROPERTY IS "USED FOR A COMMERCIAL ACTIVITY"

Joint Movants go astray from the start, with their subhead:

> Focus of 'Commercial Activity' Inquiry is on Whether the Assets
> at Issue are Used for a Commercial or Public Purpose.

Joint Memorandum at p. 21.

That is exactly wrong.  Joint Movants have ignored the landmark Supreme Court case on the issue, Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992), which stated:

> When a foreign government acts, not as regulator of a market, but
> in the manner of a private player within it, the foreign sovereign's
> actions are 'commercial' within the meaning of the FSIA.

And the FSIA itself states that

---

[17] Even if a *prima facie* case were required for issuance of the Restraining Notices, as the Joint Movants try to suggest in their brief footnote, Ex-Im Bank has presented just such a *prima facie* case by virtue of the Statutory Authorizations and other facts and circumstances presented in its Cross-Motion and Memorandum in Support.

> the commercial character of an activity shall be determined by
> reference to the nature of the course of conduct or particular
> transaction or act, *rather than by reference to its purpose.*

28 U.S.C. Section 1603(d).

As <u>Weltover</u> further explained,

> a contract to buy army boots or even bullets is a 'commercial'
> activity, because private companies can similarly use sales
> contracts to acquire goods.

<u>Weltover</u> at 614-15.

Thus the outcome in <u>Texas Trading & Mill Corp. v. Federal Republic of Nigeria,</u> 647

F.2d 300 (2d Cir. 1981).  There, the Second Circuit considered whether Nigeria's purchase of

cement qualified as a "commercial activity."  Because that sovereign nation's activity was "in

the nature of a private contract for the purchase of goods," the Court found that "its purpose to

build roads, army barracks, whatever, is irrelevant," and concluded that Nigeria's cement

purchase constituted "commercial activity" under the FSIA.  647 F.2d at 310

This long-standing doctrine, ignored by the Joint Movants, was reaffirmed four days ago.

In <u>NML Capital, Ltd. v. The Republic of Argentina</u>, --- F.3d ----, 2012 WL 1059073 (2d Cir.

March 30, 2012) at *1, the question presented was whether

> The Republic's payment of the purchase price of commercial
> goods to a seller on behalf of a third-party recipient constitutes a
> 'commercial activity' under the [FSIA].

The Court concluded

> Argentina's asserted eleemosynary or governmental motives do
> not change the fact that the [relevant New York bank account] is
> used to *purchase* scientific equipment. A 'private party engage[d]
> in trade and traffic or commerce' can purchase scientific
> equipment [citing <u>Weltover</u>].   'It is irrelevant *why* Argentina'
> made the purchases 'in the manner of a private actor; it matters
> only that it did so.'"

<u>Id.</u> at *5 (emphasis in original).

15

While ignoring these governing principles, Joint Movants make a grab-bag of fact arguments drawn from their various affidavits.  These affidavit assertions pertain exclusively to the supposed public "purpose" of the governmental functions: in other words, to precisely the wrong focus of inquiry.  Joint Movants' argument is, in effect, that buying army boots or bullets for defense *cannot* be a "commercial activity"; but <u>Weltover</u> held the opposite.

There is a further problem with Joint Movants' argument.  As noted above, Joint Movants say almost nothing about the particular transactions that the restrained funds would otherwise have been dedicated towards fulfilling.  Instead, Joint Movants, through affidavits, have provided only generalized assertions about the public purposes fulfilled by the Government Entities.  Until the amounts and purposes of the restrained funds are properly particularized, Joint Movants have failed to make any cognizable argument.

There is absolutely no basis on which to conclude that the restrained funds would not be used for "commercial activity."

## <u>THE COMMERCIAL ACTIVITY IS "IN THE UNITED STATES"</u>

In a final throw-away argument comprising seven lines, Joint Movants argue, without a single authority, that "the restrained assets are not used in the United States."  If Joint Movants are actually advancing this argument, there are several dispositive responses.  First, Joint Movants have failed utterly to show, for any particular set of funds, that the funds are not "in the United States."  Second, the Restrained Entities were all served in New York and have business operations in the United States.  Many of the flights and cruise ships in question originate in the United States.  A wealth of evidence will be adduced through discovery that the restrained funds themselves are "used in the United States" and have a substantial commercial nexus to the United States.

Joint Movants have launched a scatter shot attack without particularized descriptions of any of the funds from any of the restrained entities.  There would be absolutely no basis for this Court to render a decision that any given set of funds did not have the required nexus.

## **CONCLUSION**

For the foregoing reasons, Ex-Im Bank respectfully requests that this Court grant Ex-Im Bank's cross-motion for discovery.  Moreover, Ex-Im Bank respectfully requests that the Court hold the other pending questions in abeyance; and set an expedited discovery and briefing schedule for resolution of the pending issues.


Dated: New York, New York            SULLIVAN & WORCESTER LLP
       April 3, 2012

            By:/s/_____
               Paul E. Summit
               Andrew T. Solomon
               Courtney Evanchuck
               1290 Avenue of the Americas, 29th Floor
               New York, New York 10104
               Tel: (212) 660-3000

               *Attorneys for Plaintiff-Judgment Creditor*

TO:
Stephen D. Greenblatt, Esq.
The Law Office of Stephen D. Greenblatt
480 Broadway, Suite 328
Saratoga Springs, NY  12866

*Attorneys for Interested Third Parties Grenada Airports Authority,*
*Aviation Services of Grenada Ltd., Grenada Ports Authority,*
*National Water and Sewage Authority of Grenada, and*
*Grenada Solid Waste Management Authority*

Brian E. Maas, Esq.
Frankfurt Kurnit Kelin & Selz PC
488 Madison Avenue
New York, New York 10022

*Attorneys for Defendant/Judgment Debtor Grenada*