UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE EXPORT-IMPORT BANK OF THE REPUBLIC OF CHINA,

Plaintiff/Judgment Creditor,

-against-

GRENADA,

Defendant/Judgment Debtor.

06 CV 2469 (HB) (AJP)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CROSS-MOTION FOR DISCOVERY AND TURNOVER OF RESTRAINED FUNDS**

SULLIVAN & WORCESTER LLP
Paul E. Summit
Andrew T. Solomon
Courtney Evanchuk
1290 Avenue of the Americas, 29th Floor
New York, NY 10104
T. 212.660.3000
F. 212.660.3001

*Attorneys for Plaintiff/Judgment Creditor*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................... ii

PRELIMINARY STATEMENT .................................................... 1

ARGUMENT .................................................... 2

I. FSIA § 1610(c) Is A Red Herring .................................................... 2

II. Ex-Im Bank Has No "Threshold Burden" To Produce Evidence Of The Grenada Entities' Alter Ego Status; If Ex-Im Bank Had Such A Burden, It Has Met It .................................................... 3

III. Ex-Im Bank Is Obviously Entitled To Discovery .................................................... 6

IV. The Restrained Funds Are Used For A Commercial Activity In The United States .................................................... 7

CONCLUSION .................................................... 10

**TABLE OF AUTHORITIES**

Cases

Bayer & Willis Inc. v. Republic of Gam.,
283 F. Supp. 2d 1 (D.D.C. 2003) ........ 3, 7

Behring Int'l, Inc. v. Imperial Iranian Air Force,
475 F. Supp. 383 (D.N.J. 1979) ........ 4

Delizia Ltd. v. Eri.,
No. 09 Civ. 3572, 2012 WL 695436 (S.D.N.Y. Mar. 5, 2012) ........ 3

First City, Texas-Houston, N.A. v. Rafidain Bank,
197 F.R.D. 250 (S.D.N.Y. 2000) ........ 3

First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,
462 U.S. 611 (1983) ........ 4, 5

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,
295 F. Supp. 2d 366 (S.D.N.Y. 2003) ........ 3, 4

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,
306 F. Supp. 2d 482 (S.D.N.Y. 2004) ........ 4

Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,
305 F. Supp. 2d 304 (S.D.N.Y. 2004) ........ 4

Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,
313 F.3d 70 (2d Cir. 2002) ........ 4

Ned Chartering & Trading, Inc. v. Republic of Pak.,
130 F. Supp. 2d 64 (D.D.C. 2001) ........ 3

Peterson v. Iran,
627 F.3d 1117 (9th Cir. 2010) ........ 4

Republic of Arg. v. Weltover, Inc.,
504 U.S. 607 (1992) ........ 7, 8

Republic of Phil. v. Pimentel,
553 U.S. 851 (2008) ........ 4

Trans Commodities, Inc. v. Kazakstan Trading House,
No. 96 Civ. 9782, 1997 WL 811474 (S.D.N.Y. May 28, 1997) ........ 3

Walters v. Indus. & Commercial Bank of China, Ltd.,
651 F.3d 280 (2d Cir. 2011) ........ 3

Statutes

28 U.S.C. § 1603(d) .......... 7, 8

28 U.S.C. § 1608(e) .......... 2

28 U.S.C. § 1610(a) .......... 7

28 U.S.C. § 1610(c) .......... 7

N.Y. C.P.L.R. § 5222 .......... 2, 4

## PRELIMINARY STATEMENT

Joint Movants are scrambling to re-cast their position. The sequence of events goes like this:

*First*, in their March 20, 2012 opening brief, Joint Movants made a half-hearted argument—in a footnote—that Ex-Im Bank should have obtained permission from the Court before serving the Restraining Notices.[1] And the next day, their counsel acknowledged to Ex-Im Bank in writing that the bank is entitled to discovery on the issues presented by their Joint Motion to Vacate Restraining Notices ("JM Motion").

*Then*, on April 3, 2012, Ex-Im Bank filed its Memorandum in Opposition, and in support of its Cross-Motion ("Ex-Im Memo"). This document appears to have had a rather dramatic impact on the strategic thinking of the Joint Movants.

*Now*, in a bid to "shut down" the restraints immediately, for good, and without examination, Joint Movants argue at length and extensively that the Court must: a) *immediately* vacate the restraints, even though most have been in place for more than five months, because of a supposed procedural defect (previously footnoted), and b) deny all discovery, notwithstanding all the affidavits and documents on which Joint Movants relied to oppose the restraints. See Reply Memorandum of Law in Support of JM Motion ("JM Reply").

There is no authority for such an extraordinary outcome. The restraints should stay in place. Discovery should proceed without further delay on the issues presented by the JM Motion.[2] The Court should also set a briefing schedule for resolution of the pending issues.

---

[1] Unless otherwise noted herein, all defined terms are taken from those set forth in Ex-Im Bank's Memorandum of Law in Opposition to Joint Motion to Vacate Restraining Notices; And in Support of Cross-Motion for Discovery and Turnover of Restrained Funds.

[2] Indeed, as explained infra, discovery should already have commenced; the Joint Movants have simply ignored lawful discovery demands.

## ARGUMENT

### I. FSIA § 1610(c) Is A Red Herring

FSIA § 1610(c) neither imposes an obligation on Ex-Im Bank to seek permission prior to serving restraining notices, nor mandates vacatur of Ex-Im Bank's restraints.

FSIA § 1610(c) states:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

It refers to FSIA § 1608(e), which states:

> No judgment by default shall be entered by a court of the United States or of a State against a foreign state … unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

There are two reasons why FSIA § 1610 is a sideshow here:

1. Restraining notices under N.Y. C.P.L.R. § 5222 are neither attachments nor executions, for all the reasons set forth in the Ex-Im Memo. See Ex-Im Memo, pp. 12-13. Ex-Im Bank cited a wealth of case law and commentary to that effect (id.), rendering rather mysterious Joint Movants' assertion that Ex-Im Bank "proffered" its argument "without even a single citation to a supporting case or commentary." JM Reply, p. 3. Joint Movants simply ignored the authority.

2. Even if § 1610(c) were to apply here, it is simply a notice provision, requiring that a "reasonable period of time has elapsed following the entry of judgment."[3] Here, judgment entered on March 16, 2007. Do Joint Movants seriously contend that sufficient time has not elapsed? Thus, even if this Court were to hold for any reason that Court approval was essential, the proper remedy would be to grant the approval forthwith. The debts that have existed from the Restrained Entities would still exist, the newly issued restraints would cover them, and nothing would change.[4]

## II. Ex-Im Bank Has No "Threshold Burden" To Produce Evidence Of The Grenada Entities' Alter Ego Status; If Ex-Im Bank Had Such A Burden, It Has Met It

Again, Joint Movants struggle to transform a popgun from their initial brief to a piece of heavy artillery.

In their initial brief, Joint Movants cited one case in a footnote, JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366 (S.D.N.Y. 2003), to argue that the restraints should be vacated pending final adjudication of the Grenada Entities' alter ego status. Memorandum of Law in Support of JM Motion ("JM Memo"), p. 13, n.8. As set forth in the Ex-Im Memo, JSC is easily distinguished: it is a *pre-judgment case* seeking *a*

[3] Indeed, all of the cases cited by Joint Movants for their "advance notice required" argument are default judgment cases. See Walters v. Indus. & Commercial Bank of China, Ltd., 651 F.3d 280, 288 (2d Cir. 2011); First City, Texas-Houston, N.A. v. Rafidain Bank, 197 F.R.D. 250, 256 (S.D.N.Y. 2000); Trans Commodities, Inc. v. Kazakstan Trading House, No. 96 Civ. 9782, 1997 WL 811474 (S.D.N.Y. May 28, 1997); Delizia Ltd. v. Eri., No. 09 Civ. 3572, 2012 WL 695436, at *2 (S.D.N.Y. Mar. 5, 2012).

[4] The Court could either order the restraints issued *nunc pro tunc* to their start date; or, approve them as of the day of the hearing. The practical outcome, we believe, would be identical. Two cases are illustrative. In Bayer & Willis Inc. v. Republic of Gam., 283 F. Supp. 2d 1, 7 (D.D.C. 2003), the Court granted plaintiff's request for re-issuance of a writ of garnishment *nunc pro tunc* pending discovery into the alter ego status of third-party garnishee. In Ned Chartering & Trading, Inc. v. Republic of Pak., 130 F. Supp. 2d 64, 66-68 (D.D.C. 2001), the Court declined to find writs of attachment valid *nunc pro tunc* because, at the time the writs issued, just three weeks had elapsed since entry of judgment, which the Court deemed not to be a "reasonable time" under § 1610(c). Id. at 67. By the time the issue came before the Court, however, six weeks had elapsed since the entry of judgment. Id. The Court found that six weeks was sufficient under § 1610(c) and ordered re-issuance of the restraints. Id. at 68. Here, where more than five years have passed since entry of judgment, the Court should find the Restraining Notices valid *nunc pro tunc*, or order their immediate re-issuance (which has the same effect on the Restrained Funds).

*preliminary injunction*. In JSC, the plaintiff, after obtaining a judgment against a debtor, initiated a new action against the debtor and two individual defendants; sought a *preliminary injunction* against the two individual defendants; and served them with restraining notices. In vacating the restraining notices, the Court stated that the plaintiff could not use the restraining notices as an end-run around the requirements of *pre-judgment attachment*. Id. at 393. It is simply wrong for the Joint Movants to contend, as they do, that "*JSC* involves the exact same procedural scenario at issue in the present case…." JM Reply, p. 9, n.6. Yet this pre-judgment attachment case, governed by utterly different standards,[5] is their sole authority for their attempt to shift their burden to Ex-Im Bank. [6]

Even if Ex-Im Bank had some burden to make a prima facie showing of alter ego status, it has done so. Recall the standards from First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"), the seminal case:

[5] Any possible doubt as to the procedural context is resolved by a quick review of a follow-up case, JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 306 F. Supp. 2d 482 (S.D.N.Y. 2004). There, plaintiff was once again seeking *pre-judgment attachment* against Jossem, one of the "two individual defendants" referred to in the description above of the earlier case. The Court carefully reviewed the statutory requirements for a prejudgment "order of attachment", including the "probability of success on the merits" and the possibility that the individual defendant might "frustrate the enforcement of a *judgment that might be rendered….*" Id. at 485 (emphasis added). Needless to say, these are entirely different standards from those governing in this post-judgment context.

[6] Joint Movants cite a grab-bag of other cases throughout their memo, each of which requires only brief comment. The Republic of Phil. case turned on the interpretation of the federal rules governing joinder in the context of an attachment; there were no restraining notices served by any party to the case. Republic of Phil. v. Pimentel, 553 U.S. 851, 854 (2008). Similarly, there was no discussion of restraining notices in Peterson, a 9th Circuit decision in which sovereign immunity was raised in the context of execution on a default judgment. Peterson v. Iran, 627 F.3d 1117 (9th Cir. 2010). In Behring Int'l, a New Jersey federal district court addressed only the narrow question of whether, under the particular circumstances of that case, the FSIA prohibited pre-judgment attachment of a foreign sovereign's property. Behring Int'l, Inc. v. Imperial Iranian Air Force, 475 F. Supp. 383, 388 (D.N.J. 1979). Finally, nothing in Karaha Bodas suggests that the district court specifically authorized § 5222 restraining notices before they were issued. Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 78 (2d Cir. 2002). In fact, in a later ruling by the district court in Karaha Bodas, the court stated that "[t]here was no court order and no court determination regarding any issues under C.P.L.R. § 5222(b)." Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 305 F. Supp. 2d 304, 307 (S.D.N.Y. 2004).

> [W]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other…

Id. at 629. The Court went on to say:

> [O]ur cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice….

Id. (internal quotations omitted). And it cited favorably a case of the International Court of Justice, Case Concerning The Barcelona Traction, Light & Power Co., 1970 I.C.J. 3:

> The wealth of practice already accumulated on the subject in municipal law indicates that the veil is lifted, for instance, to prevent misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance, to protect third persons such as a creditor or purchaser, or to prevent the evasion of legal requirements or obligations…

Id. at 630. As previously set forth, the Authorizing Statutes establish that Grenada has *sweeping, plenary powers* over the finances, governance, policies, employees, boards of directors, and day to day activities of the Grenada Entities. Ex-Im Memo, pp. 5-11. Even though Ex-Im Bank discussed these plenary powers over many pages, and even though it showed that the individual affiants were (at best) "shading" the facts in their "interpretation" of these powers, the *Joint Movants have not even attempted to refute Ex-Im Bank's presentation.* This alone sets out a prima facie case.

Finally, Joint Movants' argument is one of timing: that the restraints should be vacated until final adjudication. But the Joint Movants *waited over five months* before finally moving before this Court in connection with the restraints. Then, Ex-Im Bank promptly noticed a tight discovery schedule. If this schedule had been executed, discovery would already have been virtually complete by the time of the upcoming oral argument on May 14. Joint Movants' response was to ignore the discovery propounded as if it did not exist. Thus, the business of

taking discovery (which is obviously essential here) has been further delayed. That is the fault of the Joint Movants, *not* the fault of Ex-Im Bank. Still, Ex-Im Bank will execute on a rapid and efficient discovery plan if the Joint Movants will cooperate with it.

## III. Ex-Im Bank Is Obviously Entitled To Discovery

Initially, the Joint Movants conceded that Ex-Im Bank was entitled to discovery:

- On March 21, 2012, Brian Maas, counsel to Grenada, wrote in an e-mail to counsel for Ex-Im Bank that he and Steven Greenblatt, counsel to the Grenada Entities, were "generally in agreement that a discovery schedule and briefing schedule is appropriate."

- Later that day, Mr. Greenblatt confirmed that he and Mr. Maas were "happy to work out a reasonable discovery and briefing schedule to allow for full development of [the issues presented in the brief]."[7]

See Declaration of Paul E. Summit in Further Support of Cross-Motion for Discovery and Turnover of Restrained Funds, submitted herewith ("Summit Reply Decl."), Ex. 1. And that position was natural, given that they had relied on six substantive affidavits in their Joint Motion; and had stated that "all facts and evidence necessary to assess the validity of EX-IM's Restraining Notices are known by or in the possession of the officers and directors of the Statutory Corporations." JM Memo, p. 11.

Once the Joint Movants had reviewed Ex-Im's Memo, however, exposing the blatant contradictions between (on the one hand) the sweeping powers of the central government set forth in the Authorizing Statutes, and (on the other hand) the conclusory and interpretive statements of the affiants, the Joint Movants had a sudden change of heart. They are now determined to make sure that their affiants are *not* subjected to the rigors of cross-examination on their affidavits. Ex-Im Bank is obviously entitled to discovery, on the alter ego question, as well

[7] To be sure, Joint Movants tried to "condition" discovery on an agreement by Ex-Im Bank to vacate the restraints. This was both illogical and unacceptable to Ex-Im Bank, and was rejected.

as the other "defenses" raised by the Grenada Entities.[8] For all of these reasons, discovery is necessary[9] before resolution of the ultimate issue of turnover of the Restrained Funds.

## IV. The Restrained Funds Are Used For A Commercial Activity In The United States

The FSIA defines "commercial activity" as:

> [E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

In the seminal case, Republic of Arg. v. Weltover, Inc., 504 U.S. 607 (1992), the Court held that:

> [W]hen a foreign government acts, not as regulator of a market, but *in the manner of a private player within it*, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that that commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), *the question is not whether the foreign government is* acting with a profit motive or instead with the aim of *fulfilling uniquely sovereign objectives*. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are *the type of*

---

[8] Ex-Im Bank is entitled to discovery on Grenada's interest in the Restrained Funds; the amount and location of the Restrained Funds; and the use of the Restrained Funds in "commercial activity" under the FSIA. See Ex-Im Memo, pp. 10-11, 16; see also Bayer & Willis Inc. v. Republic of Gam., 283 F. Supp. 2d 1, 7 (D.D.C. 2003) (ordering further discovery of a Gambian instrumentality's activities in the United States and its relationship to the foreign sovereign judgment debtor before ordering execution on the instrumentality's assets).

The location of the Restrained Funds is relevant to the ultimate determination of the JM Motion and Ex-Im's turnover motion. See 28 U.S.C. § 1610(a). There is no dispute that a portion of the Restrained Funds, those owed by Virgin Atlantic Airways, is on deposit with the Clerk of this Court. See Docket #67. British Airways has also agreed, pending Court approval of a stipulation signed by all parties, to deposit Restrained Funds with the Court. The Joint Movants have not informed Ex-Im Bank or the Court of the location (or, for that matter, the amount) of the remainder of the Restrained Funds.

[9] Simultaneous with service of the Ex-Im Memo (on April 3, 2012), Ex-Im Bank served discovery. This discovery included depositions that were to begin today, May 1, 2012, with the deposition of Rodney George, the Chairman of the Grenada Airports Authority. In a pattern of response to discovery that is unfortunately all too typical of Grenada, the deposition notices and document requests were simply ignored. On Monday, April 30, the day before the deposition, we had an email exchange with the Joint Movants in which they advised that they had no intention of complying with the scheduled depositions and document production. See Summit Reply Decl., Ex. 2.

> *actions by which a private party engages in "trade and traffic or commerce"…*

Id. at 614 (emphasis added; citations omitted).

And the Court concluded its discussion this way:

> Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, *because private companies can similarly use sales contracts*…

Id.

The Joint Movants have fundamentally misapprehended these standards. They contend that "the Restrained Payments are collected as part of the Statutory Corporations' overall responsibility for public services and facilities in Grenada," somehow (they believe) insulating the Restrained Funds from Weltover. JM Reply, p. 12. But Weltover says the opposite. Joint Movants are impermissibly focusing on the supposed "purpose" of the activity (in their words, the "statutory corporations' regulation of and provision of access to Grenada's public facilities and services.") Id., p. 13. But that is precisely contrary to the teaching of Weltover; after all, what is more "sovereign" and "public" than an army, which Weltover used for its famous "bullets" example?

Moreover, airports and ports are in fact *often* private, which leads to the most fundamental point under Weltover and the FSIA: identification of the "commercial character" of the "*particular* transaction or act...." (28 U.S.C. § 1603(d)). Ambrose Phillip, the General Manager of the Grenada Ports Authority, sets forth the following examples of "fees and charges" that the authority collects from the cruise ships: "Berth Occupancy: Fee charged for the use of a wharf and its facilities"; and "Overtime: Overtime wages paid to launch crews." Greenblatt Decl., Ex. O, ¶ 3. Rodney George, the Chairman of the Grenada

Airports Authority, identifies "parking fee[s]" and "baggage screening charge[s]." Id., Ex. M, ¶ 3. In other words, just as an army (or a private hunter) buys bullets, so do cruise ships and airlines pay fees and charges for use of particular ports and airports. No amount of blowsy rhetoric about "public purpose" can cure the Joint Movants' fundamental problem under the FSIA and Weltover.[10]

Finally, as to the United States nexus: we pointed out in the Ex-Im Memo that these are U.S.-based ships and airlines originating flights and cruises from JFK and other US airports and ports to Grenada.[11] In response to this simple but powerful reality, Joint Movants ask the Court to look at "the language of the enabling statutes defining the collection, use and purpose of the collected funds…." JM Reply, p. 14. Just what does that mean? Windy rhetoric is no substitute for facts. The reality is that Joint Movants are in possession of all the relevant facts about the amounts restrained, their connection to the United States, etc., and have not even attempted to demonstrate the absence of a satisfactory U.S. nexus.

[10] Joint Movants are so desperate for an argument here that they resort to the contention that the "fees and charges" set forth in the Affidavits are "akin to the taxation a sovereign government would levy for similar use of similarly public facilities and services." JM Reply, p. 12. Joint Movants may wish otherwise, but none of the affiants regard the payments in question as "taxes." Indeed, if these are "taxes," then *any* payment of money is a tax, an argument that collapses in absurdity.

[11] And many of the funds are now on deposit in the Southern District of New York.

**CONCLUSION**

For the foregoing reasons, Ex-Im Bank respectfully requests that the Court grant Ex-Im Bank's Cross-Motion for discovery, hold the Joint Motion in abeyance, and set an expedited discovery and briefing schedule for resolution of the pending issues.

Dated: New York, New York
May 1, 2012

SULLIVAN & WORCESTER LLP

By: /s/ *Paul E. Summit*
Paul E. Summit
Andrew T. Solomon
Courtney Evanchuk
1290 Avenue of the Americas, 29th Floor
New York, New York 10104
Tel: (212) 660-3000

*Attorneys for Plaintiff-Judgment Creditor*