# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

N.Y.S.D. Case #
06-cv-2469(HB)

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of September, two thousand and fourteen.

Before:     Gerard E. Lynch,
            Raymond J. Lohier, Jr.,
            Susan L. Carney,
                    *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 12, 2014

Export-Import Bank of the Republic of China,

Plaintiff - Appellant,


v.                                                          **JUDGMENT**
                                                           Docket No. 12-2619

Grenada,

Defendant - Appellee,


The Grenada Airports Authority, The Grenada Solid Waste Management Authority, The National Water and Sewage Authority of Grenada, The Grenada Ports Authority, Aviation Services of Grenada Ltd.,

Interested - Third - Party - Appellees.

The appeal in the above captioned case from a judgment and order of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the appeal is DISMISSED in part, the judgment and order of the district court is AFFIRMED in part and VACATED in part, and the cause is REMANDED.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

12-2619-cv
*Export-Import Bank of the Republic of China v. Grenada*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

————————

August Term, 2012

(Argued: March 6, 2013      Decided: September 12, 2014)

Docket No. 12-2619-cv

————————

EXPORT-IMPORT BANK OF THE REPUBLIC OF CHINA,

*Plaintiff-Appellant,*

–v.–

GRENADA,

*Defendant-Appellee,*

THE GRENADA AIRPORTS AUTHORITY,
THE GRENADA SOLID WASTE MANAGEMENT AUTHORITY,
THE NATIONAL WATER AND SEWAGE AUTHORITY OF GRENADA,
THE GRENADA PORTS AUTHORITY,
AVIATION SERVICES OF GRENADA LTD.,

*Interested-Third-Party-Appellees.*

————————

Before:

        LYNCH, LOHIER, AND CARNEY, *Circuit Judges*.

       This action arises out of the efforts of Appellant Export-Import Bank of the Republic of China ("Ex-Im Bank") to recover on a $21 million judgment entered in its favor against Appellee Grenada by the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*).  Ex-Im Bank appeals from the District Court's order (1) granting Grenada's motion to declare certain funds, once deposited with the District Court, and consisting of money owed by Grenada to a law firm that represented it in connection with an unrelated arbitration, immune from attachment pursuant to the Foreign Sovereign Immunities Act; (2) granting Grenada's motion to vacate restraining notices served by Ex-Im Bank upon certain entities that owe money to several statutory corporations formed by Grenada; and (3) denying Ex-Im Bank's request for post-judgment discovery to identify assets of Grenada that are potentially subject to attachment in satisfaction of the judgment.  The District Court determined that neither the funds owed by Grenada to the law firm nor the funds owed to Grenada's statutory corporations fall within the "commercial activity" exception to immunity from execution of judgment set forth in the Foreign Sovereign Immunities Act.  We conclude that: (1) we cannot consider whether the funds owed by Grenada to the law firm are subject to execution by Ex-Im Bank because that issue became moot when those funds were disbursed to Grenada; and (2) with the possible exception of certain funds used to service bonds issued to finance Grenada's main airport, the funds owed to Grenada's statutory corporations are not subject to execution because they are not used for commercial activity in the United States.  Because the record before us provides an inadequate basis for determining whether the bond-related funds belong to Grenada or are used for commercial activity in the United States—and in light of the Supreme Court's recent decision in *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014)—we vacate the denial of Ex-Im Bank's request for post-judgment discovery and remand for the District Court to consider the request anew.  The appeal is **DISMISSED** in part; the judgment of the District Court is **AFFIRMED** in part and **VACATED** in part; and the cause is **REMANDED**.

_____

2

PAUL E. SUMMIT (Andrew T. Solomon, *on the brief*), Sullivan & Worcester LLP, New York, NY, *for Plaintiff-Appellant*.

BRIAN E. MAAS (Khianna N. Bartholomew, *on the brief*), Frankfurt Kurnit Klein & Selz, P.C., New York, NY, *for Defendant-Appellee*.

STEVEN D. GREENBLATT, The Law Office of Steven D. Greenblatt, Saratoga Springs, NY, *for Interested-Third-Party Appellees*.

——————————

SUSAN L. CARNEY, *Circuit Judge*:

This case involves the protracted efforts of Export-Import Bank of the Republic of China ("Ex-Im Bank") to execute on a $21 million judgment in its favor against the country of Grenada. The judgment, entered in 2007 by the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*), arose from four loans made by Ex-Im Bank to Grenada between 1990 and 2000.

In the loan documents, Grenada waived its sovereign immunity from suit in federal court in New York in connection with the transactions, and thus the District Court was able to enter a valid judgment against Grenada for the

3

amounts owed.  Nonetheless, Ex-Im Bank has encountered obstacles in

attempting to enforce the judgment in the United States, largely because the

Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602-1611,

protects the assets of a sovereign in the United States from attachment or

execution in satisfaction of the judgment.  Only if one of the narrow exceptions

set out by the FSIA in section 1610 of title 28 applies will Ex-Im Bank be able to

pursue satisfaction of its judgment on such assets.

On appeal, we are asked to review the District Court's decision denying

attachment of two sets of assets:  first, funds Grenada owes to a private law firm

doing business in New York for legal services rendered to Grenada in an

unrelated arbitration; and, second, funds that commercial third parties (primarily

airlines and cruise lines having some United States-based operations) owe to

several Grenadian statutory corporations.  *Export-Import Bank of Republic of China

v. Grenada*, 876 F. Supp. 2d 263 (S.D.N.Y. 2012).  We are also asked to review the

District Court's denial of certain discovery requested by Ex-Im Bank in relation

to its attachment and execution efforts.

As to the first set of funds, we conclude that we lack jurisdiction to

consider whether it is subject to attachment, and we therefore DISMISS the

4

appeal in that respect. As to the second set, we decide that, with one possible

exception, the funds are not subject to attachment because they are not "used for

commercial activity in the United States" within the meaning of the FSIA. We

therefore AFFIRM that aspect of the District Court's ruling. Certain funds

remitted by various airlines through an international air transport industry

organization with U.S. operations, however, are allegedly used to service bonds

issued to finance Grenada's main airport. As to that subset, we conclude that the

record before us provides an inadequate basis for determining whether the funds

either belong to Grenada or are used for commercial activity in the United States.

For this reason, and in light of the Supreme Court's recent decision in *Republic of*

*Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014), which rejected any

perceived FSIA-based restrictions on discovery related to a foreign sovereign's

assets in the United States, we VACATE the District Court's order insofar as it

denied Ex-Im Bank's request for post-judgment discovery as to the bond-related

funds. We therefore REMAND the cause to enable the District Court to address

that request anew.

5

**BACKGROUND**

Between 1990 and 2000, Ex-Im Bank extended four loans, with principal totaling approximately $28 million, to Grenada. In the loan documents, Grenada agreed to repay the loans in United States currency deposited into New York City bank accounts. It also warranted that the loans were "commercial acts," and waived its sovereign immunity from suits in the United States related to the loans and from attachment of related property.[1]

Grenada defaulted on the loans. In March 2007, the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*) granted summary judgment against Grenada in the amount of the approximately $21 million then owed to Ex-Im Bank in principal, plus pre-judgment interest,

---

[1] The waiver provision in the loan agreements states in relevant part:

> [Grenada] represents and warrants that this Agreement and the Loan being made hereunder is a commercial . . . act and that the Borrower is not entitled to claim immunity from legal process with respect to itself or any property owned by it . . . on the ground of sovereignty . . . [and] [t]o the extent that [Grenada] or any property owned by it . . . has or hereafter may acquire any right of immunity from . . . attachments or execution of judgment . . . [Grenada] hereby irrevocably waives such right to immunity for itself and such property . . . .

Loan Agreement § 9.06, Dist. Ct. Dkt. No. 9, Ex. 4.

1  attorneys' fees, and statutory interest.[2]  Since 2007, Ex-Im Bank has tried, without

2  success, to recover the judgment.

3      The FSIA protects foreign sovereigns from suit in United States courts.  It

4  protects the property of foreign sovereigns in the United States as well:  it directs

5  that, subject only to several narrow exceptions, "the property in the United States

6  of a foreign state shall be immune from attachment[,] arrest and execution."  28

7  U.S.C. § 1609.  Only one such exception is relevant here:  under some

8  circumstances, the FSIA permits a creditor to execute a judgment against assets

9  of a foreign sovereign if the assets are in the United States when attached and are

10  "used for a commercial activity in the United States."  *Id.* § 1610(a).  At issue in

11  this case are Ex-Im Bank's efforts under New York law to attach and execute the

12  judgment against two separate sets of Grenada-related assets located in the

13  United States: the "Grynberg Funds" and the "Restrained Funds."

14

15

---

[2] The District Court entered an initial judgment in February 2007, granting Ex-Im Bank's motion for summary judgment.  Shortly thereafter, Ex-Im Bank moved the court to amend the judgment on the ground that it did not set forth the particularized amounts to which Ex-Im Bank was entitled.  The March 2007 amended judgment entered in response to that motion grants Ex-Im Bank the following amounts: $21,586,057.38 owed from the default, $3,323,586.90 in prejudgment interest, $82,225.00 for attorneys' fees, and post-judgment statutory interest and costs.

7

## I.  The "Grynberg Funds"

In early 2010, RSM Production Corporation ("RSM") and its individual

shareholders—three members of the Colorado-based Grynberg family—brought

claims against the government of Grenada before an international arbitration

panel.  RSM and the Grynbergs alleged, *inter alia*, that Grenada breached an

agreement between RSM and Grenada when it declined to grant RSM a

petroleum exploration license.  During the arbitration, the international law firm

Freshfields Bruckhaus Deringer LLP ("Freshfields") represented Grenada.  In late

2010, the arbitration panel found for Grenada on the merits, dismissed the

claims, and ordered the Grynbergs and RSM to pay Grenada's fees and costs,

plus prejudgment interests, in the amount of approximately $298,000, plus

interest (the "Grynberg Arbitration Award").

In February 2011, Grenada filed suit against RSM and the Grynbergs in the

United States District Court for the Southern District of New York, seeking

confirmation of the international arbitration award.  In April 2011, the District

Court (Deborah A. Batts, *Judge*) entered judgment in Grenada's favor (the

"Grynberg Judgment").   Soon after, Grenada filed a separate action in the

United States District Court for the District of Colorado, seeking registration of

8

the Grynberg Judgment and recovery on the Grynberg Arbitration Award.

Grenada then moved in Colorado to have writs of garnishment issued against

RSM, the Grynbergs, and US Bank and JP Morgan Chase Bank, N.A. ("JP Morgan

Chase"), each of which held funds belonging to one of the Grynbergs.

In July 2011, after learning of Grenada's New York and Colorado lawsuits,

Ex-Im Bank served restraining notices issued under New York law on US Bank

and JP Morgan Chase.  It also served restraining notices on Freshfields and

Grenada's Colorado counsel.  The effect of the notices was to restrain these

entities from taking any action to disburse the funds owed to Grenada in

connection with the Grynberg Judgment.[3]

The following month, Ex-Im Bank and Grenada entered into a stipulation

(the "Stipulation") lifting the restraining notices but requiring Grenada to

deposit any funds previously subject to those notices with the United States

District Court for the Southern District of New York, pending Judge Baer's

determination of Ex-Im Bank's rights to the funds in connection with the

---

[3]  Under N.Y. C.P.L.R. 5222, a "restraining notice" may be issued by the clerk of court or the attorney for the judgment creditor and served upon, with one exception, "any person," *id.* at 5222(a), including parties who "owe[ ] a debt to the judgment debtor or obligor," *id.* at 5222(b). Parties subject to a restraining notice issued and served under New York law are "forbidden to make . . . any sale, assignment, transfer or interference with any property" subject to the notice, with certain exceptions.  *Id.*

9

judgment entered in 2007 in Ex-Im Bank's favor.  In November, 2011, Grenada—

which in the meantime had recovered approximately $300,000 from the

Grynbergs and RSM—deposited this sum (the "Grynberg Funds") with the

District Court.[4]

In February 2012, Grenada moved for an order declaring the Grynberg

Funds immune from attachment under the FSIA, and Ex-Im Bank moved for

turnover of the Grynberg Funds.  Grenada argued principally that, under the

FSIA, the funds were immune from attachment.  Ex-Im Bank argued that the

funds fell within the FSIA's "commercial use" exception to immunity.

## II.    The "Restrained Funds"

Ex-Im Bank concurrently sought to collect on its judgment against

Grenada by restraining several airlines and cruise lines, a shipping company,

and the International Air Transport Association ("IATA") (collectively the

"Restrained Entities") from making certain ongoing payments related to their

---

[4]  The bulk of the Grynberg Funds which were owed to Freshfields was held in the District
Court.  When Grenada's Colorado counsel demanded that it be paid $3,500 from the Grynberg
Funds for services rendered in connection with the Colorado action, however, Ex-Im Bank
consented to the requested payment and that sum was disbursed.

use of facilities located in Grenada.[5]  The payments, comprised primarily of

taxes, fees, and other charges, were owed to certain corporate entities (the

"Statutory Corporations"), which Grenada created to perform various civic

functions, such as managing Grenada's airports, seaports, and similar facilities.[6]

Charges associated with the use of certain air transport facilities in Grenada are

payable not to a Grenada statutory corporation, however, but to the IATA, with

operations in the United States, as we discuss further below.

In its restraining notices—served in November 2011 pursuant to New York

law—Ex-Im Bank asserted that the Restrained Entities "may owe a debt to the

judgment debtor, Grenada, or may be in possession or in custody of property in

which the judgment debtor has an interest."  *See, e.g.*, Restraining Notice to

Virgin Atlantic Airways, Joint Appendix ("J.A.") 472-74 (citing N.Y. C.P.L.R.

5222(b)).  By virtue of the notices, Ex-Im Bank laid claim to the stream of funds

---

[5]  The "Restrained Entities" are Princess Cruise Lines, Ltd., Cunard Cruise Line, MSC Cruises, Disney Cruise Line**,** Virgin Atlantic Airways, Delta Airlines, Inc., Caribbean Airlines Ltd., the International Air Transport Association (served at two addresses, one in New York and one in Washington, D.C.), BWIA International Airways Ltd., British Airways PLC, and the Mediterranean Shipping Company (USA) Inc.

[6]  The "Statutory Corporations" are the Grenada Airports Authority ("GAA"), the Grenada Solid Waste Management Authority, the National Water and Sewage Authority of Grenada, the Grenada Ports Authority, and Aviation Services of Grenada Ltd., which is a wholly-owned subsidiary of the GAA.

11

normally paid by the Restrained Entities to the Statutory Corporations (the "Restrained Funds").

In response, all but one of the Restrained Entities withheld the payments owed to the Statutory Corporations. Virgin Atlantic Airlines instead chose to deposit with the District Court, pending resolution of Ex-Im Bank's rights, funds it would ordinarily pay to the Statutory Corporations, directly or through IATA.

In March 2012, Grenada and the Statutory Corporations moved in the District Court to vacate the restraining notices.[7] They asserted that the Restrained Funds are not subject to attachment, arguing that: the Statutory Corporations are juridical entities separate from Grenada that cannot be held responsible for Grenada's debts; and that, in any event, the FSIA immunizes the Restrained Funds from attachment. In support of their motions, Grenada and the Statutory Corporations submitted affidavits made by various executives in the Statutory Corporations, describing the structure and purpose of each of those entities, on what basis each charged fees, and how each planned to use the Restrained Funds. Ex-Im Bank opposed the motions and cross-moved for

---

[7] Pursuant to N.Y. C.P.L.R. 5240, the Statutory Corporations are "interested parties," with independent standing to challenge the restraining notices. For this reason, they are identified in the caption of this matter as Interested-Third-Party-Appellees.

12

discovery related to the operations of the Statutory Corporations and their

planned use of the Restrained Funds.

### III.    District Court Decision

In an Opinion and Order issued on June 22, 2012, the District Court

granted Grenada's motion for a declaration that the Grynberg Funds are immune

from attachment; granted Grenada's and the Statutory Corporations' motions to

vacate the restraining notices; and denied Ex-Im Bank's motion for discovery

related to the Restrained Funds.  *Exp.-Imp. Bank of Republic of China v. Grenada*,

876 F. Supp. 2d 263 (S.D.N.Y. 2012) ("*Grenada*").

The court held that neither set of funds, in the FSIA's words, was

"property in the United States of a foreign state . . . used for a commercial

activity in the United States," and that they were therefore immune from

attachment, notwithstanding Grenada's various waivers.  *See id.* at 264-65

(quoting 28 U.S.C. § 1610(a)).[8]  With respect to the Grynberg Funds, it reasoned

that because Grenada had not yet transferred the Grynberg Funds to Freshfields,

the funds had yet to be "used" for any commercial activity in the United States.

*Id.* at 265.  With respect to the Restrained Funds, the District Court declined to

---

[8]  The District Court observed that Grenada waived sovereign immunity from attachment and execution in the loan agreement with Ex-Im Bank.  *Grenada*, 876 F. Supp. 2d at 265.

address whether the Statutory Corporations are liable for the judgment against

Grenada on the theory that they are alter egos of Grenada.  *Id.* at 267.  Rather, the

court determined that, even assuming them to be Grenada's alter egos, the FSIA

bars the notices, because the Restrained Funds were not "used for commercial

activity" since "[t]he payments that the Corporations receive from the[]

Restrained Entities are used as a source of revenue for carrying out public

functions in Grenada."  *Id.*  In reaching this conclusion, the court focused both on

their source and the use to which the Restrained Funds were put.  The court

observed, for example, that "the Restrained Funds are not involved in regular

commercial transactions, but rather are collected as part of the Corporations[']

regulation of and provision of access to Grenada's public facilities and services."

*Id.*

Finally, the District Court denied Ex-Im Bank's request for further post-

judgment discovery.  After reviewing the parties' "supplemental submissions

regarding the extent of discovery and what Ex-Im Bank needed to show to obtain

discovery," the court concluded simply that "discovery [wa]s not warranted."

*Id.* at 267 n.5.

14

## IV.     Subsequent Procedural History

After the District Court issued its decision, Ex-Im Bank sought to stay

vacatur of the restraining notices and disbursement of the Grynberg Funds

pending appeal.  On August 17, 2012, the District Court denied the motion, but

granted a temporary stay until August 31, 2012.  Ex-Im Bank then moved this

Court for a stay, and on October 3, 2012, the motion was denied.  Shortly

thereafter, all restraining notices were lifted, and the Grynberg Funds were

disbursed.

## DISCUSSION

On appeal, we are asked to consider whether the District Court erred in

concluding that the Grynberg Funds and the Restrained Funds are immune from

attachment under the FSIA and whether the District Court exceeded its

discretion in denying Ex-Im Bank's request for certain post-judgment discovery.

With regard to the Grynberg Funds, we conclude that Ex-Im Bank's appeal

is moot because the funds have already been released to Grenada.  With regard

to most of the Restrained Funds, we conclude that the FSIA does not permit Ex-

Im Bank to attach them because they are not "used for a commercial activity in

the United States."  As to a certain subset of the Restrained Funds, however, the

factual record before us provides an inadequate basis to determine whether the funds may be attachable. For this reason, and in light of recent Supreme Court precedent interpreting the FSIA not to bar broad discovery in aid of executing a judgment against a sovereign, we vacate the District Court's order insofar as it denied Ex-Im Bank post-judgment discovery. We therefore remand for further proceedings with respect to that issue.

## I. Legal Framework

As a matter of common law, foreign sovereigns have long been recognized as presumptively immune from suit in United States courts. *See Samantar v. Yousuf*, 560 U.S. 305, 311-12 (2010). Implementing this presumption, the practice for many years was for the State Department to file a "suggestion of immunity" in cases regarding particular foreign sovereigns. S*ee id.* at 311-13. Over time, inconsistency and unpredictability came to characterize the government's practice in applying the immunity doctrine. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487-88 (1983). With a goal of regularizing that practice and establishing the jurisdiction of United States courts in certain circumstances to hear claims against foreign nations, Congress in 1976 enacted the FSIA. *Id.* at 488.

16

The FSIA strongly reflects the presumption of immunity:  except in few

limited circumstances, it provides that "a foreign state *shall be immune* from the

jurisdiction of the courts of the United States and of the States."  28 U.S.C. § 1604

(emphasis added).  As a further element of immunity, it provides that—also

subject to certain exceptions—"the property in the United States of a foreign state

shall be immune from attachment[,] arrest and execution."  28 U.S.C. § 1609.

Thus, to sue successfully and enforce an award against a foreign state in a United

States court, a plaintiff must demonstrate *both* that the foreign state is not

immune from suit *and* that its assets in the United States are not immune from

attachment or execution.

In this case, Grenada waived its immunity from suits arising out of the

loans on which it defaulted.  It also waived sovereign immunity from attachment

and execution.  *See* Loan Agreement § 9.06, Dist. Ct. Dkt. No. 9, Ex. 4; *supra* note

1.  Notwithstanding these waivers, it argues that its assets in the United States

are immune from attachment to satisfy the judgment against it.  Our task is to

determine whether, as Ex-Im Bank contends, any one of the assets at issue falls

within one of the exceptions to the FSIA's grant of immunity.

17

1    The relevant exceptions appear in two subsections of the Act:

2    section 1610(a), which deals with property belonging to a foreign state, and

3    section 1610(b), which deals with property belonging to an agency or

4    instrumentality of a foreign state.  Under the former provision—which lies at the

5    core of this appeal—a party may execute against "[t]he property in the United

6    States of a foreign state," even when the state has waived its immunity to

7    attachment or execution, only to the extent that such property is "used for a

8    commercial activity in the United States."  28 U.S.C. § 1610(a).[9]

9    In interpreting these provisions, we are mindful of the historical context

10   (referenced above) within which the FSIA was enacted.  Common law extended

---

[9] As relevant here, section 1610 provides:

> (a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if . . . (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver . . . .

28 U.S.C. § 1610(a)(1).  This provision is far narrower than that applicable to property belonging to an "agency or instrumentality of a foreign state."  28 U.S.C. § 1610(b).  Under section 1610(b), a party may execute against "*any* property" belonging to the agency or instrumentality, regardless of its use, as long as the agency or instrumentality is "engaged in commercial activity in the United States."  *Id.* (emphasis added).  Neither party argues that section 1610(b) applies to any of the Statutory Corporations here.

18

1  virtually absolute immunity from suit to sovereign nations.  *See Samantar*, 560

2  U.S. at 311-12 (citing *Schooner Exch. v. McFaddon*, 7 Cranch 116 (1812)).  This

3  doctrine of "complete" sovereign immunity, adopted and applied by our own

4  courts through the mid-twentieth century, carried a number of unintended

5  consequences, including that it "deprived private citizens [and corporations]

6  conducting business with foreign governments of a legal remedy in court."  M.

7  Mofidi, *The Foreign Sovereign Immunities Act and the "Commercial Activity"*

8  *Exception: The Gulf Between Theory and Practice*, 5 J. INT'L LEGAL STUD. 95, 98 (1999).

9  In 1952, the State Department responded to such concerns by adopting a new

10  rule in a document that later became known as the "Tate Letter," which

11  proposed limiting the doctrine of complete sovereign immunity.[10]  *See*

12  *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 251-52 (5th Cir.

13  2002) ("*Connecticut Bank*").  In the Tate Letter, the State Department announced

14  that it would "recommend denying immunity in suits based on a foreign

15  sovereign's strictly commercial activities."  *Id.* at 252.  But the Letter also

---

[10]  The letter was transmitted by Jack B. Tate, Acting Legal Adviser at the State Department, to Philip B. Perlman, Acting Attorney General.  *See* Letter of Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't State Bull. 984-85 (1952); *see also Samantar*, 560 U.S. at 312-13; App'x 2 to Opinion of the Court in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711-15 (1976) (reproducing text of Tate Letter).

recognized a distinction between immunity from suit and immunity from

execution of judgment.  Thus, even "[i]f a plaintiff successfully obtained a final

judgment against a foreign sovereign, he still had to rely on the foreign state to

pay the judgment voluntarily."  *Id.*

The FSIA shifted the responsibility for making determinations about

foreign sovereign immunity from the Executive Branch to the Judiciary.  *Id.*  Like

the Tate Letter, the Act ended blanket immunity from suit on claims arising from

the commercial conduct of foreign sovereigns in the United States.  *Id.*  But,

unlike the Tate Letter, it also provided private litigants with a mechanism—albeit

a circumscribed one—for executing on the property in the United States of a

foreign state.  *Id.*   The limitations of that mechanism can, in some cases, still

render the grant of jurisdiction under the FSIA entirely ineffectual, essentially

providing a "right without a remedy."  *De Letelier v. Republic of Chile*, 748 F.2d

790, 798 (2d Cir. 1984).   The potential for this anomaly was recognized and

tolerated by Congress, however, in enacting the FSIA, *id.* at 798-99, and so cannot

bear heavily on our analysis.[11]

---

[11] This feature was also consistent with the international legal backdrop for Congress's
enactment of the FSIA:

1    In this case, to find that Ex-Im Bank may attach either set of funds, we

2    must conclude that those funds are: (1) "property in the United States"; (2) "of a

3    foreign state," i.e., that they belong to Grenada; and (3) that they are "used for a

4    commercial activity in the United States" when the writ of attachment or

5    execution issues.  *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d

6    120, 130 (2d Cir. 2009); *see also Conn. Bank*, 309 F.3d at 253-54.

7    We review a district court's ruling on a request for an order of attachment

8    for abuse of discretion.  *See NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d

9    254, 257 (2d Cir. 2012).  We similarly review a district court's discovery rulings

10   for abuse of discretion.  *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d

11   Cir. 2012) ("*EM II*").  A district court is said to have abused its discretion if it has

12   based its ruling on an erroneous view of the law, made a clearly erroneous

---

[In passing the FSIA,] Congress sharply restricted immunity from execution against agencies and instrumentalities, but was more cautious when lifting immunity from execution against property owned by the State itself. Congress passed the FSIA on the background of the views of sovereignty expressed in the 1945 charter of the United Nations and the 1972 enactment of the European Convention, which left the availability of execution totally up to the debtor state, and its own understanding as the legislative history demonstrates, that prior to 1976 property of foreign states was absolutely immune from execution. . . .  It is plain then that Congress planned to and did lift execution immunity [only] "in part." . . . [S]ince it was not Congress' purpose to lift execution immunity wholly and completely, a right without a remedy does exist [in certain contexts].

*De Letelier*, 748 F.2d at 799.

assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions. *NML Capital, Ltd.*, 680 F.3d at 257.

## II.    The Grynberg Funds

We do not have jurisdiction to consider whether the Grynberg Funds are attachable because that question has been mooted by the release of those funds from the District Court. As we have stated in other contexts, to have jurisdiction over a dispute, "at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural. When the issues in dispute between the parties are no longer live, a case becomes moot." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (internal citation and quotation marks omitted). In this case, put simply, the Grynberg Funds no longer exist in the United States as potentially attachable property of Grenada. The dispute as to these funds is therefore moot.

Ex-Im Bank presents two arguments to the contrary. First, it asserts that another, similar arbitration brought by RSM against Grenada in 2004 resulted in an award of arbitration fees and costs against RSM, and contends that the amenability to attachment of any recovery on that award depends on our resolution of the Grynberg Funds question. Second, it maintains that, because

22

Ex-Im Bank still might be able to recover the Grynberg funds from Grenada or "their ultimate destination" (presumably, Freshfields), their amenability to attachment presents a live case or controversy. Appellant's Br. 25 n.12. Neither of these circumstances, however, suffices to revive the dispute.

### A.   The RSM Arbitration

In 2004, the Grynbergs' company—RSM—initiated arbitration with Grenada, alleging claims against the country related to those the family members brought in the Grynberg Arbitration six years later. In March 2009, an arbitration panel found for Grenada after determining that Grenada had not breached any obligation to RSM. The panel also concluded that each party should bear its own arbitration costs.

In June 2009, RSM moved the arbitrators to annul the March arbitration judgment. Pursuant to regulations of the International Centre for Settlement of Investment Disputes ("ICSID"), which governed the arbitration, RSM was responsible for financing the annulment proceeding. In 2010, however, after RSM and the Grynbergs initiated the separate Grynberg Arbitration, RSM (as alleged by Grenada) "stopped complying with its obligation to finance the annulment proceedings." Application and Mem. of Law for Recognition and

23

Entry of ICSID Award as Judgment at 5, *In re Application of Grenada v. RSM Prod. Corp.*, No. 1:11 Misc. 188 (S.D.N.Y. June 3, 2011), ECF No. 1.

In early 2011, an *ad hoc* committee of arbitrators for the ICSID issued an order discontinuing the annulment proceedings for lack of payment. In conjunction with that order, the *ad hoc* committee ordered RSM to pay Grenada's legal fees and costs of arbitration, amounting to $186,072.81 (the "RSM Arbitration Award"). *See id.* at 7. Shortly thereafter, Grenada moved in the United States District Court for the Southern District of New York for confirmation of the RSM Award and for judgment against RSM. *Id.* at 1.

In August 2011, Ex-Im Bank and Grenada entered into the Stipulation that we have described above with respect to the Grynberg Funds (and whose terms apply also to the RSM Award). *See* J.A. 85-87. In it, Grenada undertook to attempt to collect the RSM Award and agreed that "[a]ny funds collected by Grenada in connection with collection efforts . . . shall be deposited with the [District] Court." *Id.* at 87.

According to Ex-Im Bank's brief on appeal, Grenada has yet to collect any funds in satisfaction of the RSM Award, let alone deposit them with the District Court. Nevertheless, Ex-Im Bank argues that our determination of the status of

24

the Grynberg Funds will necessarily resolve the status of the RSM Funds, and

that therefore the legal question regarding the Grynberg Funds is not moot,

notwithstanding their disbursement to Grenada.  We are not persuaded.

As an initial matter, it is simply not apparent that any resolution of the

status of the Grynberg Funds will necessarily resolve the status of the RSM

Funds.  Nothing in the August 2011 Stipulation suggests that the District Court's

determination of Ex-Im Bank's rights to the Grynberg Funds would govern the

Bank's rights to the RSM Funds, or vice versa.  Nor have we been directed to any

agreement between the parties that would require release to Ex-Im Bank of the

RSM Funds were we to order repayment to Ex-Im Bank of the Grynberg Funds.

Further, even if our decision regarding the Grynberg Funds bore in some

direct way on the proper treatment of the RSM Funds, the Grynberg Funds issue

would still be moot.  Ex-Im Bank has pointed to no evidence that the Grynberg

Funds remain in Grenada's possession in the United States.  No matter how

helpful a decision on the merits may be in also resolving the Bank's rights to the

RSM Funds, such a decision would be merely advisory.  *See Cnty. of Suffolk, N.Y.*

*v. Sebelius*, 605 F.3d 135, 137-38 (2d Cir. 2010) (concluding that plaintiff's claims to

recover grant funding from the federal government were moot because the

funding had already been disbursed to other grant applicants).

B.    Recovery from Grenada or Freshfields

Ex-Im Bank further disputes the mootness of the Grynberg Funds issue on

the theory that "an order of this Court to the effect that the Grynberg Funds

belong to Ex-Im Bank would then require Grenada to return those funds

forthwith to Ex-Im Bank."  Appellant's Br. 25 n.12.  This contention ignores that,

under the FSIA, the Grynberg Funds were arguably subject to attachment only

after they were deposited with the District Court and—according to Ex-Im Bank,

at least—"designat[ed]" for commercial use in the United States:  namely,

payment to Freshfields.  *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 484 (2d

Cir. 2007) ("*EM I*") (holding that funds were unavailable for attachment under

section 1610 because they were never used for, or designated for use in,

commercial activity).  The withdrawal of the funds from deposit with the District

Court has fundamentally altered their status.  The funds no longer exist as

discrete property of Grenada held in the United States and arguably designated

for a commercial use in the United States.  Once the Grynberg Funds were

transferred to Grenada, they became part of the undifferentiated property of the

1    sovereign.  In these circumstances, we do not have jurisdiction to consider

2    whether, in retrospect, those funds might have been attachable when they were

3    on deposit in the District Court.[12]   *Cf. Fidelity Partners, Inc. v. First Trust Co. of*

4    *N.Y.*, 142 F.3d 560, 564-66 (2d Cir. 1998) (stating that an "attachment . . .

5    proceeding" is moot where the property the judgment creditor seeks to attach

6    "no longer exists").

7         Even if Grenada paid the Grynberg Funds directly to Freshfields in the

8    United States, and this payment constituted "commercial activity in the United

9    States," the Grynberg Funds issue would still be moot.  Under Federal Rule of

10   Civil Procedure 69, the "procedure on execution" in federal court upon a money

11   judgment "must accord with the procedure of the state where the court is

12   located."  Fed. R. Civ. P. 69(a)(1).  We thus look to New York law to determine

13   what property might be attachable in execution of Ex-Im Bank's judgment

14   against Grenada.  Pursuant to N.Y. C.P.L.R. 5201(b)—which identifies the

---

[12] Like the District Court, our Court declined to stay vacatur of the restraining notices and thus allowed Grenada to re-acquire and then disburse the Grynberg Funds to Freshfields.  It may seem unfair to show litigants to the exit because we tore up their entry ticket, but such considerations cannot alter our conclusion here.  As a jurisdictional matter, we cannot hear a case that does not present a live case or controversy.  We note our concern, however, about treating as purely "commercial use" the expenditure of funds for securing representation in legal proceedings.  This concern, among others, might have weighed here in favor of denying the motion to stay disbursement, as to which Ex-Im Bank bore the burden.

"[p]roperty against which a money judgment may be enforced"—a judgment

creditor may execute against the property of a judgment debtor "whether [that

property] consists of a present or future right or interest and whether or not it is

vested."  The statute does not, however, contemplate execution against property

that once belonged to the judgment creditor but now lawfully belongs to a third

party.  In other words, even if Grenada actually used the Grynberg Funds for the

purpose Ex-Im Bank argued those funds were designated for when they were

deposited in the District Court, the payment of the funds to Freshfields would

render the question of their attachability moot.  We therefore dismiss the appeal

with respect to the Grynberg Funds.

**III.    The Restrained Funds**[13]

The District Court dedicated only a brief segment of its opinion to

considering whether the streams of payments made by the Restrained Entities to

the Grenadian Statutory Corporations are immune from attachment.  It

concluded that the funds are not used for commercial activity in the United

---

[13]  Although the restraining notices were lifted when we denied Ex-Im Bank's stay request, the attachability of the Restrained Funds, unlike the dispute regarding the Grynberg Funds, is not moot.  The Restrained Funds are part of several streams of payments made to the Statutory Corporations by the Restrained Entities.  Were we to conclude that these funds are not immune from execution under the FSIA, the funds from this stream would be as amenable to attachment as they were before we denied the stay, and Ex-Im Bank could still seek to attach them.

States, but rather are of a fundamentally public character, and thus do not fall

within the FSIA's "commercial activity" exception.  *See Grenada*, 876 F. Supp. 2d

at 267.

The District Court relied in its analysis on *Republic of Argentina v. Weltover,*

*Inc.*, 504 U.S. 607 (1992), the seminal Supreme Court case interpreting the phrase

"commercial activity," as defined by the FSIA,[14] for purposes of assessing a

foreign sovereign's jurisdictional immunity from suit under section 1605(a)(2).[15]

In *Weltover*, the Supreme Court considered whether Argentina was engaged in a

"commercial activity" when, in the 1980s, it issued bonds to raise United States

dollars for the purpose of stabilizing Argentina's currency.  *Id.* at 609-14.  The

Court held that, although Argentina's *purpose* in issuing the bonds was

undoubtedly of a public or governmental character, the proper focus of the

---

[14] The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  It instructs that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Id.*  The phrase "commercial activity" is used in several of the Act's sections, including sections 1605 (the jurisdictional-immunity provision at issue in *Weltover*) and 1610 (the attachment-immunity provision at issue here).

[15] Notably, the *Weltover* Court did not have occasion to address immunities from attachment and execution under section 1610.  Rather, its analysis was directed at the FSIA's jurisdictional-immunity provision, section 1605(a)(2).  We nonetheless find the *Weltover* Court's analysis helpful in construing section 1610.

29

"commercial activity" inquiry under the plain language of the FSIA is the "nature," not the "purpose," of the sovereign's conduct. *Id.* at 614 (quoting 28 U.S.C. § 1603(d)). Because Argentina acted "not as regulator of a market, but in the manner of a private player within it," its conduct was "commercial" under the FSIA. *Id.* at 614.

Applying the general framework established in *Weltover*, the District Court concluded that "the Restrained Funds are not involved in regular commercial transactions, but rather are collected as part of the [Statutory Corporations'] regulation of and provision of access to Grenada's public facilities and services." *Grenada*, 876 F. Supp. 2d at 267. In support of this conclusion, the court relied primarily on a district court case holding that taxes owed by various airlines to the Republic of Nicaragua were immune from attachment under the FSIA. *See id.* (citing *LNC Invs., Inc. v. Republic of Nicaragua*, No. 96 Civ. 6360 (JFK), 2000 WL 745550, at *5 (S.D.N.Y. June 8, 2000)). According to the District Court, the Restrained Funds, like taxes, "are used as a source of revenue for carrying out public functions in Grenada." *Id.*

On appeal, the parties' arguments largely respond to the District Court's focus on the nature of the services provided in Grenada by the Statutory

30

1    Corporations in exchange for payment by the Restrained Entities.  Ex-Im Bank

2    asserts that the affidavits provided by Grenada reflect the private character of the

3    fees and other charges collected by the Statutory Corporations.  For example, the

4    Chairman of the Grenada Airports Authority ("GAA") explained in his affidavit

5    that among the "Usage Fees" the GAA collects from the airlines are a "Parking

6    Fee," a "Baggage Screening" fee, and "Overtime Charges."  J.A. 526-27.  These,

7    according to Ex-Im Bank, are "precisely the kinds of services purchased from

8    private vendors around the world."  Appellant's Br. at 30.  Grenada counters that

9    these payments from the Restrained Entities are of a governmental and

10   "exclusively public" nature: "the payment of the Restrained Funds to the

11   Statutory Corporations is compelled by Grenadian law and mandatory to the

12   users of facilities and services for which there is no privately available

13   alternative."  Appellee's Br. at 21-22.

14         In our view, the District Court erred to the limited extent that it focused its

15   analysis (as did the parties) on how Grenada *generated* the Restrained Funds

16   rather than on how Grenada *uses* them.  We agree with the District Court's

17   ultimate conclusion, however, that the Restrained Funds are not attachable

31

1    because, once generated, they are *used* to serve public purposes, and that use

2    takes place in Grenada.

3              A.    Funds Paid to Grenadian Statutory Corporations for Use of
4                    Seaports and Airports

5

6         Our Court does not appear to have addressed whether property held in

7    the United States by third parties and owed to a foreign sovereign may be "used

8    for a commercial activity in the United States" and thus subject to attachment

9    under section 1610(a) of the FSIA.  But both the Fifth Circuit and the Ninth

10   Circuit have, and we adopt their shared approach here.  *See Conn. Bank*, 309 F.3d

11   240; *Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007).

12        In *Connecticut Bank*, the Fifth Circuit considered whether assets held by

13   Texas oil companies and owed to the Republic of Congo as royalties and taxes

14   were attachable to satisfy a judgment against the Congo.  *See* 309 F.3d at 246-247.

15   In determining whether the assets were attachable, the parties and the district

16   court focused on whether the services provided by the Congo in exchange for

17   payment from the oil companies were commercial in nature.  According to the

18   Fifth Circuit, this "was the wrong question to consider."  *Id.* at 251.  "What

19   matters under the statute is not how the Congo made its money, but how it

32

spends it.  The amenability of these royalties and taxes to garnishment depends

on what they are 'used for,' not on how they were raised."  *Id.*  The court

remanded the case and instructed that, "[i]f it turns out that the royalties and tax

obligations are not used for any commercial activity in the United States, the

district court should dissolve the writs of garnishment and dismiss the action."

*Id.* at 260-61.

In *Af-Cap*, the Ninth Circuit considered a judgment-creditor's efforts to

recover a judgment against the Republic of Congo by attaching assets held by

third parties and owed to the Congo pursuant to oil-and-gas drilling agreements.

*See* 475 F.3d at 1084.  The Ninth Circuit adopted the Fifth Circuit's test, agreeing

that "the phrase 'used for' in § 1610(a) is not a mere syntactical infelicity that

permits courts to look beyond the 'use' of property, and instead try to find any

kind of nexus or connection to a commercial activity in the United States."  *Id.* at

1087 (quoting *Conn. Bank.*, 309 F.3d at 234).   Rather, the court explained, the

word "used" should be given its ordinary, conversational meaning, so that

property is "used for" commercial activity under section 1610(a) "when the

property in question is put into action, put into service, availed or employed *for* a

commercial activity," and not merely when it is used "*in connection* with a

33

commercial activity or *in relation* to a commercial activity." *Id.* at 1091 (emphases in original).

Applying this framework, the *Af-Cap* court determined that the specific assets identified as attachable by the judgment-creditor there—including money owed to the Congo by U.S. oil-and-gas companies as consideration for rights to drill and distribute oil in the Congo—were not "used for a commercial activity in the United States" because, among other things, the relevant ventures occurred abroad and, in any event, even if the funds were *generated* in connection with that commercial activity, they were not necessarily *used* commercially in the United States. *See id.* at 1094. Accordingly, the court concluded that the assets were immune from attachment. *Id.* at 1096.

We agree with the Fifth and Ninth Circuits' interpretation. First, we understand the word "used," read literally, to require not merely that the property at issue relate to commercial activity in the United States, but that the sovereign actively *utilize* that property in service of that commercial activity. *See Conn. Bank*, 309 F.3d at 254; *Af-Cap*, 475 F.3d at 1087-88. Second, we find this interpretation of the statutory language—one narrower than a general "relation to" requirement—to be more consistent with the structure and purpose of the

34

FSIA.  As described above, the statute was intended to reduce the scope of

immunity from suit previously extended to foreign sovereigns engaging in

commercial activity in the United States.  *See Conn. Bank*, 309 F.3d at 252; *Af-Cap*,

475 F.3d at 1088-89; *see also* H.R. Rep. No. 94-1487, at 7 (1976), *as reprinted in* 1976

U.S.C.C.A.N. 6604, 6605 (noting that the FSIA codifies the "restrictive principle"

of sovereign immunity, under which "the immunity of a foreign state is

'restricted' to suits involving a foreign state's public acts (jure imperii) and does

not extend to suits based on its commercial or private acts (jure gestionis)").   But

it was also designed to maintain broad immunity from attachment of a

sovereign's property in the United States.  *See* H.R. Rep. No. 94-1487, at 27

(noting that the FSIA modified the rule precluding execution against a foreign

state's property by "*partially* lowering the barrier of immunity from execution"

(emphasis added)).

        The various exceptions set forth in the FSIA itself make apparent the

statute's dual approach:  to foreign sovereign immunity from suit (on the one

hand), and to immunity of foreign assets from attachment and execution (on the

other).  Section 1605(a)(2), for example, eliminates immunity from suit in the

United States for a foreign sovereign in any case "in which the action is based

upon . . . an act performed in the United States *in connection with* a commercial

activity of the foreign state elsewhere; or upon an act outside the territory of the

United States *in connection with* a commercial activity of the foreign state

elsewhere" that causes a "direct effect in the United States."  28 U.S.C. §

1605(a)(2) (emphases added).  The "in connection with" language allows for suits

against a foreign sovereign that merely *relate to* commercial activity.  The breadth

of this provision stands in contrast to the more limited scope of section 1610(a),

which, as explained above, allows execution upon the property of a foreign

sovereign only to the extent that the property is "*used for* a commercial activity in

the United States."  28 U.S.C. § 1610(a) (emphasis added); *see also Conn. Bank*, 309

F.3d at 255 (noting "an obvious difference in the way these two different

immunities have been crafted").

　　　　For the most part, the application of this framework to the facts presented

here is relatively straightforward.[16]  We do not consider the nature of the services

provided in Grenada by the Statutory Corporations in exchange for the

---

[16]  As did the District Court, we assume for the purpose of this analysis that the Statutory Corporations are Grenada's alter egos, and therefore are liable for the judgment against Grenada even though they were not themselves signatories to the loan agreements.  *See Grenada*, 876 F. Supp. 2d at 267.  The validity of this assumption need not be addressed here—we find the bulk of the Restrained Funds immune in any event.

36

Restrained Funds, because the *source* of the property is irrelevant to the section

1610(a) analysis.  Instead, we focus on the *use* to which Grenada puts—or clearly

intends to put, by virtue of some formal designation or other specific means—the

funds at issue.[17]  Even if, as Ex-Im Bank argues, the services provided by the

Statutory Corporations are "precisely the kinds of services purchased from

private vendors around the world," Appellant's Br. at 30, funds that the

Restrained Entities pay to the Statutory Corporations for those services in

Grenada are immune from attachment because they are not *used* by the Statutory

Corporations for commercial activity that takes place in the United States.   As

the District Court found and the record supports, the Restrained Funds (with the

possible exception of the IATA Funds, as discussed below), are devoted to

"carrying out public functions in Grenada," and "used for the maintenance of

facilities and services in Grenada."  *Grenada*, 876 F. Supp. 2d at 267 & n.6.  They

fail both the "commercial use" and the "in the United States" prongs.  They

---

[17] We need not decide today the exact contours of the phrase "*used for* a commercial activity" under the FSIA.  But our Court has previously opined that "[e]ven if actual use were not required" for attachment under section 1610(a), "at least specific designation . . . would be necessary."  *EM I*, 473 F.3d at 485.

37

therefore do not meet the "commercial activity" exception to attachment

provided by section 1610(a).[18]

B.    The IATA Funds & Post-Judgment Discovery

According to Ex-Im Bank, one subset of the Restrained Funds calls for a

different analysis.  Ex-Im Bank points to the affidavit of the Chairman of the

GAA, Rodney George, in which George states that the GAA is empowered to

collect various taxes, fees, and charges from all airlines flying into Grenada.  J.A.

526.  GAA does not collect these fees from non-Grenadian airlines, however.

Rather, it directs those airlines to "remit their Usage Fees through the

International Air Transport Association," an international industry organization

that "provides a variety of functions to the international air transport

community."  *Id.* at 527-28.[19]  In the past, according to the George Affidavit,

IATA disbursed the funds received from non-Grenadian airlines (the "IATA

Funds") directly to the GAA; however, beginning in April 2010 and lasting at

---

[18]  Because we conclude that the Restrained Funds are not subject to attachment, we need not reach Grenada's argument that the restraining notices should have been lifted because they were issued before Ex-Im Bank obtained court approval to impose them.  Grenada argues that the notices were issued in violation of 28 U.S.C. § 1610(c), which provides that no "attachment [of] or execution [on the property of a foreign state or its agencies or instrumentalities] . . . shall be permitted until the court has ordered such attachment and execution."

[19]  IATA is incorporated in Canada, but apparently has U.S.-based operations: as noted above, Ex-Im Bank served its restraining notices on IATA at its offices in New York and Washington, D.C.  *See* J.A. 506-13.

38

least until George signed his affidavit in March 2012, IATA has instead

forwarded the funds to an entity called First Citizens Trustee Services Limited

("First Citizens"). *See id.* at 528. First Citizens acts as a trustee responsible for

servicing certain bonds issued by or on behalf of the GAA (the "GAA Bonds"),

and the proceeds of the bonds are used to finance the operations of Grenada's

main airport.

Ex-Im Bank argues that, under *Weltover*, the IATA Funds may be

attachable assets. As described above, the *Weltover* Court held that Argentina

engaged in conduct of a commercial, not governmental, nature when it issued

bonds that were "in almost all respects garden-variety debt instruments: They

may be held by private parties; they are negotiable and may be traded on the

international market . . . ; and they promise a future stream of cash income." 504

U.S. at 615. The Court there explained that participation "in the bond market in

the manner of a private actor" constitutes "commercial activity" under the FSIA.

*Id.* at 617. Ex-Im Bank urges us to hold that (1) transactions relating to the GAA

Bonds "fall squarely in the *Weltover* doctrine," and (2) any portion of the IATA

Funds directed to pay United States-based holders of these bonds is "used for a

commercial activity in the United States." Appellant's Br. at 33.

39

In our view, the record before us does not provide a sufficient basis to make such determinations.  As Ex-Im Bank observes in its briefing before the Court, the factual record as to the GAA Bonds and the IATA Funds is sparse.[20] The record does not disclose many facts that would bear on a careful determination of immunity from attachment.  These include:  the manner or location in which the bonds were issued; the location of First Citizens (the Trustee responsible for servicing the bonds); the locations or identities of the bondholders (including whether they are private or public); the manner or location in which the bonds are traded; and the method by which the bondholders receive payments.  Without this information, we are unable to adequately evaluate *Weltover*'s applicability to the present action, or to discern whether the IATA Funds are "used for" commercial activity in the United States.

We note that the record is also unclear as to a separate prong of our attachability inquiry: whether the IATA Funds even belong to Grenada or one of its alleged alter egos.  In his affidavit, GAA's George alludes to an "Airport Enhancement and Financing Service Agreement" to which IATA and the GAA are parties.  J.A. 528.  According to George, "The Agreement acknowledges that

---

[20] It appears that Ex-Im Bank was not permitted to depose GAA's George.

the GAA has 'definitively and irrevocably transferred, assigned, setover and

otherwise conveyed to the Trustee . . . all of its right, title and interest in, to and

under . . . all [Usage Fees] and all rights to receive any payments relating to the

[Usage Fees]." *Id.* (alterations in the original). The agreement itself, however, is

not contained in the record before us and the language quoted is unaccompanied

by any citation; we are presented only with the recited sentence itself. In our

view, this is too thin a reed upon which to base a definitive legal judgment as to

whether the IATA Funds are the property of the GAA or, if so, whether the

GAA's property is also Grenada's. We therefore decline to rule now on whether

Ex-Im Bank may attach the IATA funds. Instead, we remand to the District

Court to consider anew the possibility of further discovery as to these issues.

Our conclusion in this regard is reinforced by the disposition and tenor of

the Supreme Court's recent decision in *Republic of Argentina v. NML Capital, Ltd.*,

134 S. Ct. 2250 (2014), which in turn affirmed our decision in *EM II*, 695 F.3d 201

(2d Cir. 2012).[21] In *EM II*, we upheld the district court's grant of post-judgment

discovery related to assets held at third-party banks in the United States by

judgment-debtor Argentina. 695 F.3d at 204-05. In so doing, we concluded that

---

[21] Both of these decisions issued after the District Court's discovery ruling in the present case.

1  judgment creditors need not satisfy the "stringent requirements for attachment"

2  under the FSIA "to simply receive information about [a sovereign's] assets."  *Id.*

3  at 209.[22]  We also noted that discovery of information related to assets held by

4  third-party banks did not infringe Argentina's sovereignty even if those assets

5  ultimately proved immune from attachment:  "Once the district court had subject

6  matter and personal jurisdiction over Argentina, it could exercise its judicial

7  power over Argentina as over any other party, including ordering third-party

8  compliance with the disclosure requirements of the Federal Rules."  *Id.*.  The

9  Supreme Court later granted certiorari in *EM II*, and affirmed.  *See NML Capital*,

10  134 S. Ct. at 2258.  The Court emphasized the absence of any FSIA provision

11  "forbidding or limiting discovery in aid of execution of a foreign-sovereign

12  judgment debtor's assets," and endorsed an approach to discovery—once

13  jurisdiction over the foreign sovereign has been established, as it has here—more

14  generally consonant with the Federal Rules of Civil Procedure.[23]  *Id.* at 2256-57.

---

[22] In arriving at this conclusion, we expressly rejected the Seventh Circuit's requirement that a judgment creditor identify specific non-immune assets before it is entitled to further discovery about those assets.  *See Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011).

[23] Indeed, as we observed in *EM II*, although a district court "has broad discretion to limit discovery in a prudential and proportionate way," discovery in aid of execution "is the norm in federal and New York state courts." 695 F.3d at 207.

In light of the Supreme Court's decision, and given the circumstances before us, we think it prudent to vacate the District Court's decision denying discovery, and remand for the District Court's reconsideration in light of the altered legal landscape. As explained above, Ex-Im Bank has had no opportunity to examine the circumstances relevant to the FSIA's application to the IATA Funds, and in particular, the uses to which those funds may be put in service of the GAA Bonds.[24] The strictures of Fed. R. Civ. P. 69 will still govern the District Court's assessment of the requested discovery, but any lingering concern that the FSIA alone might presumptively bar further discovery has been eliminated by the Supreme Court in *NML Capital*.

## CONCLUSION

In sum, we conclude that: (1) the question whether the Grynberg Funds may be attached is moot, because those funds have already been disbursed; (2) the District Court properly vacated the restraining notices against the Restrained Entities because, with one possible exception, the Restrained Funds are not "used

---

[24] In this regard, we note that IATA, like the third-party banks subject to the subpoenas duces tecum in *NML*, is acting in connection with its relationship to the GAA, but is entirely distinct from the sovereign itself. Thus, as we stated in *EM II*, the discovery was directed against entities "that ha[d] no claim to sovereign immunity, or to any other sort of immunity or privilege." 695 F.3d at 210. The FSIA immunity concerns that, pre-*NML*, might have contributed to the District Court's denial of discovery, are therefore now even more attenuated.

43

for commercial activity in the United States"; and (3) because the record does not

provide an adequate basis to determine whether the IATA Funds are used for

commercial activity in the United States and whether they belong to Grenada, we

vacate the District Court's denial of post-judgment discovery as to these funds,

and remand for the District Court to reassess whether to permit further

discovery, consistent with the Supreme Court's decision in *NML Capital* and our

decision today.  If, upon remand, the District Court decides to allow discovery,

and discovery reveals that the IATA Funds are indeed attachable under the FSIA,

the District Court may then assess, in the first instance, whether and to what

extent Ex-Im Bank may properly restrain those funds going forward.

This appeal is **DISMISSED** in part, the judgment and order of the District

Court is **AFFIRMED** in part and **VACATED** in part, and the cause

**REMANDED**.

44